Argued and submitted January 20, the decision of the Court of Appeals reversed and
judgment of the trial court affirmed December 20, 1988

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# THERESA DIXSON,
*Respondent on Review.*

(TC 84-1821; CA A34586 (Control))

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# JEFFREY D. DIGBY,
*Respondent on Review.*

(TC 84-1822; CA A34808)

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# LORIN LOU DIXSON,
*Respondent on Review.*

(TC 84-1823; CA A34817; SC S34536)
(Cases Consolidated)

766 P2d 1015

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause and filed the petition on behalf of the petitioner on review. With him on the petition were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Kathleen P. Eymann, Coos Bay, argued the cause on behalf of the respondent on review Theresa Dixon.

James Coffey, North Bend, argued the cause on behalf of the respondent on review Jeffrey D. Digby.

Nick Nylander, North Bend, argued the cause on behalf of the respondent on review Lorin Dixson.

GILLETTE, J.

## GILLETTE, J.

The issue in these criminal cases, combined for purposes of appeal, is whether the search and seizure provision in the Oregon Constitution protects land outside the "curtilage" of a residence. The Court of Appeals concluded that it does, and reversed the defendants' convictions for the manufacture and possession of controlled substances. *State v. Dixson/Digby*, 87 Or App 1, 740 P2d 1224 (1987) (plurality). We affirm the Court of Appeals conclusion that Article I, section 9, is applicable to lands like those involved in this case, but reverse that court's application of the rule to these facts.

### FACTS

Sheriff's deputies received an informant's tip that marijuana was growing on heavily forested land owned by the Rogge Lumber Company. One of the officers, after checking with the assessor's office to determine the property boundaries, flew over the land and saw marijuana growing on what he believed to be land belonging to the lumber company. The officers requested and received the company's permission to search the property for marijuana.

The officers drove onto the property by way of a public road until they reached a dirt logging road the informant had described as leading to the marijuana. Unknown to the officers, this road extended onto property being purchased by defendants Lorin and Theresa Dixson, and on which they lived. The dirt road had fallen into disuse and no longer was passable by car. The trunk of a large tree lay across the road and, a little further on, a wire cable with a "No Hunting" sign on it stretched across the road. The officers left their car and walked past the fallen tree and wire cable. Just past the cable was another dirt road running along a fence line. This road also had a wire cable and "No Hunting" sign stretched across it. The officers continued walking down this second road. At a bend in the road, they encountered another "No Hunting" sign. The area was rural and covered with thick brush. The officers were able to see marijuana plants only after pushing aside the brush. The plants, which were on the Dixsons' property, were not visible at ground level except from that property.

Returning the next day, the officers found defendant

Jeff Digby and Lorin Dixson near the marijuana plants. The officers arrested both men and seized the plants.

Defendants each were charged with the manufacture and possession of a controlled substance. They filed motions based on the Fourth Amendment to the United States Constitution and Article I, section 9, of the Oregon Constitution to suppress the evidence derived from the officers' search of their property. The trial court denied the motions, finding that Digby lacked "standing" to challenge the search on the Dixsons' property and that the Dixsons "had no legitimate expectation that the area where the marijuana was being grown [which the Court found to be outside the Dixsons' curtilage] would remain free from warrantless intrusion by the Sheriff's deputies."

Defendants appealed. The Court of Appeals, sitting in banc, reversed. A plurality of that court found that Article I, section 9, of the Oregon Constitution protects privately owned open lands from warrantless searches and seizures, and that Digby, as well as the Dixsons, had a protected privacy interest in the marijuana. *State v. Dixson/Digby, supra,* 87 Or App at 11.

## THE COURT OF APPEALS OPINIONS

A plurality of the Court of Appeals, sitting in banc, rejected an "open fields" exception to the requirements of Article I, section 9, of the Oregon Constitution. *Cf. Oliver v. United States,* 466 US 170, 104 S Ct 1735, 80 L Ed 2d 214 (1984). Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The plurality below apparently assumed that land outside the curtilage of a dwelling is not among the "effects" that are expressly protected by Article I, section 9. Nevertheless, the court concluded that the provision does protect such land, reasoning that, because Article I, section 9, was intended to protect the privacy of the individual, *see, e.g., State v. Duffy,* 135 Or 290, 297, 295 P 953 (1931), its coverage

is "as extensive as the privacy which it is designed to protect." *State v. Dixson/Digby, supra,* 87 Or App at 7.

The plurality went on to conclude that Article I, section 9, protected the Dixson's land from warrantless intrusions by the police:

> "The officers intruded into areas which are protected under common law trespass rules that existed long before the adoption of either the Fourth Amendment or Article I, section 9. Those areas are also protected under more recent criminal trespass statutes. ORS 164.205(6); ORS 164.245(1). The right to exclude unwanted intruders from them is well established. Although the land is not within the constitutional definition of 'home,' the well-established right to control entry gives the possessor of the land a privacy interest in it as against anyone with a lesser right to possession. It does not matter that the officers did not have the *mens rea* necessary to subject them to criminal liability. What matters is that statutes and the common law protect the Dixons' [*sic*] land. *See Oliver v. United States, supra,* 466 US at 189-93 (Marshall, J., dissenting). The Dixsons, therefore, had a privacy interest in the land which they could assert against the police."

87 Or App at 10-11 (footnote omitted). The plurality also concluded that Digby had a protected interest in the area, because "[h]e had a proprietary interest in the growing plants, helped care for them and had the right to exclude others from the property. In short, he was a licensee whose rights in the land were greater than those of the officers." 87 Or App at 11.

The specially concurring opinion disagreed with the plurality's conclusion that *all* land outside the curtilage of a residence is protected by Article I, section 9, from unreasonable searches and seizures. Instead, the three specially concurring judges would extend Article I, section 9, protection only to land in which the occupants' expectation of privacy has been "objectively manifested," either through the construction of artificial barriers or the posting of signs or through reliance on the land's topography, vegetation, and other natural barriers to inspection. 87 Or App at 11-16 (Buttler, J., specially concurring). The specially concurring judges also noted:

> "On the other hand, if the property's physical characteristics are such that the area in question may be seen without technological enhancement from a public place, such as a road, no amount of subjective expectation that activities in

that area will be private will make the area a constitutionally protected one. In that circumstance, the possessor would be in a situation analogous to the defendant in *State v. Owens, supra,* who carried contraband in a transparent vial (her effect) that announced its contents, thereby making it permissible for the police to seize it and test its contents."

*Id.* at 14 (footnote omitted).

Judge Van Hoomissen, dissenting, would have established an "open fields" exception to Article I, section 9, identical to the rule set out in *Oliver v. United States, supra. State v. Dixson/Digby, supra,* 87 Or App at 16-31 (Van Hoomissen, J., dissenting). That dissenting opinion relied on the similarity between the texts of Article I, section 9, and the Fourth Amendment, the desirability of a uniform standard under the state and federal constitutions, and the absence of any historical basis for deviating from the federal rule in this area. The dissent also relied on *State v. Lee,* 120 Or 643, 253 P 533 (1927), and *State v. Evans,* 143 Or 603, 22 P2d 496 (1933), for the proposition that Article I, section 9, is subject to an "open fields" exception. Finally, the dissent found persuasive federal decisions and state decisions adopting the federal rule, arguing that the rule is essential to the fight against illegal drugs,[1] and that intrusions into land outside the curtilage is not the kind of police misconduct against which Article I, section 9, was designed to protect. In sum, the dissent found "no *principled* reason to impose a higher standard governing law enforcement officers under Article I, section 9, of the Oregon Constitution, than is imposed by the Fourth Amendment." 87 Or App at 16. (Emphasis in original.)

Judge Rossman, joined by Judge Deits, also dissented, arguing that whether an intrusion into land outside the curtilage of a residence is an unreasonable search should depend on whether the occupants have exhibited a "reasonable expectation of privacy" in the area. *State v. Dixson/Digby, supra,* 87 Or App at 31-32 (Rossman, J., dissenting). This dissent would hold, "under the facts of this case, that

---

[1] *See* Saltzburg, *Another Victim of Illegal Narcotics: The Fourth Amendment (As Illustrated By the Open Fields Doctrine),* 48 U Pitt L Rev 1, 4 (1986) (suggesting that courts, in developing exceptions to constitutional protections such as the open fields doctrine, have been "cheating" by "turning their backs on fundamental constitutional principles, particularly fourth amendment principles, in order to aid the war against illicit drugs.")

these defendants did not objectively manifest a reasonable expectation of privacy in the property searched, regardless of what might have been going on in their collective heads." *Id.* at 32.

The state petitioned for review, which we granted in order to address the important issues involved.

## ANALYSIS

In its petition for review, the state argues that this court already has adopted an "open fields" exception to the requirements of Article I, section 9, citing *Lee.* There, a sheriff and his deputies executed a search warrant authorizing the search of the house and outbuildings of one James Lee. The search disclosed "a quantity of moonshine and mash." *Id.* at 645. After the search, the officers went into the barnyard, where they smelled mash coming from a neighboring barn, which belonged to the defendant, Leslie Lee. Nobody was home at the defendant's residence. The officers entered the defendant's barn and discovered an illegal distillery.

The defendant argued that the warrantless entry into his barn violated Article I, section 9, because the barn was within the curtilage of his residence. The state argued that no warrant was necessary because "the officer followed his nose and located mash then fermenting and a crime was then being committed in his presence," and because Article I, section 9, did not apply to contraband.

This court concluded that the barn was not within the curtilage of the defendant's dwelling:

> "There is no intimation in the present case that the building described as a 'barn' was used for any family or domestic purpose, but solely as a distillery building for housing a still and storing articles and products necessary for the manufacture and sale of intoxicating liquors. Illicit mash, stills and intoxicating liquor are contraband. No person can hold title or ownership therein. The Constitution invoked in this case is not applicable to searches and seizures of contraband goods situated and found by an officer in the manner described herein * * *."

120 Or at 649-650. The court concluded that "[w]e are unable to find from the record that the search and seizure in this case at bar was unreasonable." 120 Or at 651. The court put forth

three bases for that conclusion: that the barn was outside the curtilage of the defendant's residence, that the evidence seized was contraband and, as such, was not protected by the constitution, and that the officers perceived, with their own senses, that a crime was being committed in their presence. It is not possible to determine the ground on which the court relied for its holding. We cannot tell, for example, what the Court might have ruled had the officers not smelled the mash, or if the Court had believed that, even if contraband was not protected by the Constitution, the places where it was kept might be protected. Thus, we cannot conclude with any degree of certainty that *Lee* established an "open fields" exception.

*State v. Evans,* 143 Or 603, 22 P2d 496 (1933), also cited by the state, is of no greater help. In *Evans,* a police officer discovered illegal elk meat in the defendants' camp, which was located on public land. The trial court instructed the jury that, if the officer had reason to believe that the defendants' camp contained evidence of a game violation, he had a right to search it without obtaining a search warrant. On appeal, the defendants argued that the officer did not have reason to believe that they had committed a game violation. This court, noting that the defendants had not filed a motion to suppress the evidence in the trial court, found sufficient evidence from which the jury could conclude that the officer had reasonable grounds for making the search. *Id.* at 611. The court added:

> "The inhibition against search and seizure does not extend to woods or open fields or public lands, such as a forest reserve. Cornelius, Search and Seizure, (2d Ed.) § 11, p. 49; 27 A.L.R. 732; 39 A.L.R. 828."

*Id.* The state relies on the language quoted above which, as the facts of the case amply demonstrate, was a *dictum.* Thus, while both *Lee* and *Evans* contain language that abstractly aids the state, a close analysis shows that neither case actually or necessarily decided the proposition for which the state now cites it.

This court is not required blindly to follow earlier "rules" of constitutional law. Our responsibility for constitutional interpretation is an ongoing one which we will not sidestep by relying on *Lee,* in which there is no analysis other than a citation to Corpus Juris and authorities from other

states; nor will we base our decision on the unconsidered *dictum* in *Evans.* We turn to an examination of the issue before us.

The state argues that this court should adopt an "open fields" exception to Article I, section 9, for the reasons expressed in the majority opinion in *Oliver v. United States, supra.* In *Oliver,* the police, without first obtaining a warrant, went to Oliver's farm to investigate reports that he was raising marijuana there. They drove past Oliver's house to a locked gate with a "No Trespassing" sign on it. On foot, they followed a path around the gate and along the road for several hundred yards. As they passed a barn and a parked camper, they heard someone standing by the camper shout, "No hunting is allowed, come back up here." The officers identified themselves and approached the camper, but found no one. They continued walking until they found a field of marijuana over a mile from Oliver's house.

In a consolidated case considered by the Supreme Court along with *Oliver,* police entered a wooded area behind defendant Thornton's house by a path between the house and a neighbor's house. They followed the path to two marijuana patches, which they later learned were on Thornton's property.

The *Oliver* majority relied on the following rationale for holding that the Fourth Amendment does not protect land outside the curtilage of a dwelling: First, the language of the amendment expressly protects from unreasonable search and seizure only "persons, houses, papers, and effects." The majority concluded that the framers of the Fourth Amendment "would have understood the term 'effects' to be limited to personal, rather than real, property." 466 US at 177 n 7, citing *Doe v. Dring,* 2 M & S 448, 454, 105 Eng Rep 447, 449 (KB 1814); 2 W Blackstone, Commentaries *16, *384-*385.

Second, at common law, a distinction was drawn between the curtilage of a home and other land surrounding the home. In the majority's view, this distinction bolstered its conclusion that the framers of the Fourth Amendment did not intend to extend its protection to land outside the curtilage; it also demonstrated that society historically has had a reduced expectation of privacy in such land. 466 US at 180.

Third, land outside the curtilage of a dwelling "do[es] not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance"; thus, those who perform the activities typically conducted in such areas do not require or expect a great deal of privacy. 466 US at 179.

Finally, the desirability of a uniform rule and the problems inherent in fashioning and enforcing a case-by-case approach outweigh any privacy interests that may exist in land outside the curtilage of a dwelling. 466 US at 181.

The state and one of the Court of Appeals dissenters argue that the above reasons wholly justify an interpretation of Article I, section 9, that parallels the federal rule. Although in interpreting Article I, section 9, we are not bound either by the Supreme Court's holding in *Oliver* or by its method of tackling the problem, we will examine its underlying rationale, to the extent that they are pertinent to an Article I, section 9, inquiry.[2]

At the outset, two caveats are in order. First, after the Court of Appeals decided this case and the petition for review

_____

[2] The Court of Appeals dissent also considered it significant that most state courts that have considered the issue under their state constitutions have adopted the *Oliver* rule. Most of those contain little or no analysis. Many of the cases adopting an "open fields" rule merely rely, without independent state constitutional analysis, on federal and other state court decisions interpreting the Fourth Amendment. *See, e.g., People v. Grundeis,* 413 Ill 145, 108 NE2d 483 (1952); *Williams v. State,* 201 Ind 175, 166 NE 663 (1929); *State v. Stokes,* 511 So2d 1317 (La App 1987); *People v. Ring,* 267 Mich 657, 255 NW 373 (1934); *State v. Seaton,* 679 SW2d 908 (Mo App 1984); *State v. Ladue,* 73 Mont 535, 237 P 495 (1925); *State v. Havlat,* 222 Neb 554, 385 NW2d 436 (1986); *Commonwealth v. Treftz,* 465 Pa 614, 351 A2d 265 (1976); *Beasley v. State,* 683 SW2d 132 (Tex App 1984); *State v. Weigand,* 169 W Va 739, 289 SE2d 508 (1982); *Conrad v. State,* 63 Wis 2d 616, 218 NW2d 252 (1974).

Others rely on a restrictive reading of the items protected by the state search and seizure provision. *See, e.g., Brown v. State,* 48 Ala App 84, 261 So2d 914 (1971), *aff'd* 288 Ala 732, 261 So2d 919 (1972) ("possessions" does not include open fields); *Brent v. Commonwealth,* 194 Ky 504, 240 SW 45 (1922) ("possessions"); *State v. Pinder,* 128 NH 66, 514 A2d 1241 (1986) ("possessions"); *Ratzell v. State,* 27 Okla Crim 340, 228 P 166 (1924) ("effects"). *But see Barnard v. State,* 155 Miss 390, 124 So 479 (1929) (the word, "possessions," in section 23 of the Mississippi Constitution of 1890 includes unenclosed lands); *Welch v. State,* 154 Tenn 60, 289 SW 510 (1926) (hog lot, enclosed by a fence and occupied by the defendant as a necessary part of his farming operation, was a "possession" within the meaning of the search and seizure provision in the Tennessee Constitution). These decisions are not persuasive because they offer no historical evidence, such as statements made during their state constitutional debates, for their interpretations. Rather, they generally rely on what they perceive as the "plain meaning" of the language of the provision.

was filed, this court expressly rejected the federal "reasonable expectation of privacy" test for defining protected privacy interests under Article I, section 9, of the Oregon Constitution. *State v. Campbell,* 306 Or 157, 163-165, 759 P2d 1040 (1988). Second, we note that the Supreme Court's use of the term "open fields" is not precise. As used by that court, the term encompasses lands that are neither fields nor, in any fair sense of the word, open; the open fields doctrine denies Fourth Amendment protection to all undeveloped and unoccupied land outside the curtilage of a residence. *Oliver v. United States, supra,* 466 US at 180 n 11. We therefore frame the question presented by this case in what we believe to be more realistic terms — not whether the requirements of Article I, section 9, are subject to an exception for "open fields," but whether that provision prohibits unreasonable searches and seizures conducted on land that falls outside the curtilage of a dwelling.

### 1. The textual argument.

The state argues that, because Article I, section 9, like the Fourth Amendment, expressly protects "persons, houses, papers and effects," the state provision should be interpreted the same way that the United States Supreme Court has interpreted the Fourth Amendment. That argument has some obvious validity, because the language of a constitutional provision must have some meaning if it is to be interpreted in any principled manner. On the other hand, Article I, section 9, has acquired a meaning over the years that is hard to reconcile with the literal interpretation advocated by the state.

Our prior decisions establish that Article I, section 9, does not protect property alone; in a broader sense, it also protects an individual's "privacy interest," which we have defined as an interest in freedom from certain forms of governmental scrutiny. *State v. Campbell, supra,* 306 Or at 170. In *Campbell,* the police used a radio transmitter to monitor the movements of the defendant's automobile as it travelled on public streets. The police did not search the automobile itself, or any other "effect" of the defendant, but this court nevertheless held that the use of the transmitter was a search under Article I, section 9, because:

"[I]f the state's position in this case is correct, no movement, no location and no conversation in a 'public place'

would in any measure be secure from the prying of the government. There would in addition be no ready means for individuals to ascertain when they were being scrutinized and when they were not. That is nothing short of a staggering limitation upon personal freedom. We could not be faithful to the principles underlying Article I, section 9, and conclude that such forms of surveillance were not searches."

*Id.* at 172.

Similarly, a literal interpretation of Article I, section 9, would afford no protection from such things as the police interception of a private telephone conversation from a public telephone booth. As the dissent in *Oliver* pointed out, even a literalist United States Supreme Court has not been *that* literal: "[n]either a public telephone booth nor a conversation conducted therein can fairly be described as a person, house, paper, or effect; yet we have held that the Fourth Amendment forbids the police without a warrant to eavesdrop on such a conversation." *Oliver v. United States, supra,* 466 US at 185 (Marshall, J., dissenting) (footnote omitted) (citing *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967)).

There is a second problem with the literal interpretation proposed by the state. If we were to rely on the language of Article I, section 9, to limit its protection to "persons, papers, houses, and effects [*i.e.,* personal property]," that interpretation necessarily would exclude all kinds of real property except houses. There would be no principled way to distinguish, based on the language itself, office buildings, churches, schools, commercial establishments, and the like, from other kinds of real property.[3] The drafters of Article I,

---

[3] The problems inherent in attempting such a distinction are illustrated by the following quotation:

"Suppose an artist rents a studio in an office building, shopping center, hotel, motel or industrial park. Is the studio protected by the fourth amendment? Yes! Now, suppose the same artist builds a studio on land outside the curtilage of the home, but surrounds the studio with a fence and protects it with locks on the door. Is this protected? The answer is 'no' if the studio is regarded as an open field and 'yes' if it is regarded as something else. Perhaps the [United States Supreme] Court would say that a studio is not an open field.

"Now, what if the artist turns a barn or loft into a studio? It is either protected by the fourth amendment or unprotected depending on the answer to the question posed above: is a barn an open field or something else? Suppose the Court says that a barn is protected. Does this mean that an artist who chooses to

section 9, are unlikely to have intended to exclude from its protections all real property except houses, *i.e.,* structures where people customarily reside. The scope of the section is broader than a literal reading of its terms.[4]

■      We conclude that we cannot rely on a literal reading of Article I, section 9. To hold that the provision applies only to those items specifically enumerated therein would undermine the rationale that we have identified as the touchstone of Article I, section 9 — the right to be free from intrusive forms of government scrutiny — and would open up prior decisions of this court, such as *State v. Campbell, supra,* to serious question. We decline to take that step. Article I, section 9, protects the privacy of the individual from certain kinds of governmental scrutiny. If the individual has a privacy interest in land outside the curtilage of his dwelling, that privacy interest will not go unprotected simply because of its location.

2.    *The argument based on the common-law distinction between the curtilage of a dwelling and other land.*

The state and one of the dissenters below point out that, at common law, a distinction was drawn between the curtilage of a dwelling and other land. In *Hester v. United States,* 265 US 57, 59, 44 S Ct 445, 68 L Ed 898 (1924), Justice Holmes wrote:

> "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law."

---

leave the barn and paint outdoors where the light is better may not claim protection in a fenced area secluded from third parties? If the artist plants trees to assure privacy and erects a barrier to keep third parties out, why is the fourth amendment not applicable? The only reason is that the Supreme Court said so."

Saltzburg, *supra* at 18-19 (footnote omitted).

4 So is the scope of the Fourth Amendment, unless the Supreme Court in *Oliver* meant to overrule, *sub silentio,* a line of cases going back more than fifty years recognizing constitutional protection for structures that were neither houses nor other structures within the curtilage of any house. *See, e.g., Silverthorne Lumber v. United States,* 251 US 385, 40 S Ct 182, 64 L Ed 319 (1919) (business office); *Gouled v. United States,* 255 US 298, 41 S Ct 261, 65 L Ed 647 (1921) (office); *Amos v. United States,* 255 US 313, 41 S Ct 266, 65 L Ed 654 (1921); *Go-Bart Importing Co. v. United States,* 282 US 344, 51 S Ct 153, 75 L Ed 374 (1930) (business office); *See v. City of Seattle,* 387 US 541, 87 S Ct 1737, 18 L Ed 2d 943 (1967) (business premises).

The *Oliver* majority also emphasized the common-law distinction:

> "[T]he common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home. See 4 W. Blackstone, Commentaries *225. The distinction implies that only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach to the home. At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' * * * and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. * * * Conversely, the common law implies, as we reaffirm today, that no expectation of privacy legitimately attaches to open fields."

466 US at 180 (citations omitted; footnote omitted).[5]

We question Justice Holmes' reading of this section of Blackstone's treatise. In the chapter of Blackstone's Commentaries cited by the Supreme Court, Blackstone discussed the common-law requirement that burglary take place in a dwelling, or "mansion-house":

> "[I]n the burglary of a private house: which is the most frequent, * * * it is indispensably necessary, to form its guilt, that it must be in a mansion or dwelling house. For no distant barn, warehouse, or the like, are under the same privileges, nor looked upon as a man's castle of defence: nor is a breaking open of houses wherein no man resides, and which therefore for the time being are not mansion-houses, attended with the same circumstances of midnight terror. A house however, wherein a man sometimes resides, and which the owner hath only left for a short season, [with the intention of returning], is the object of burglary; though no one be in it at the time of the fact committed. And if the barn, stable, or warehouse, be parcel of the mansion-house and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects

---

[5] For an interesting analysis of *Hester*, arguing that the decision can be read as deciding far less than the court relied upon it for in *Oliver*, see Saltzburg, *supra* n 2, at 6-9 (1986).

and privileges all its branches and appurtenant, if within the curtilage or home-stall."

4 Blackstone, Commentaries *225 (footnote omitted). Thus, although the common law unquestionably recognized the concept of "curtilage," it did so to enlarge the definition of a dwelling to encompass nearby structures used in conjunction with the dwelling, so that the invasion of any of them could constitute burglary. Saltzburg, *supra* n 2, at 15-16; *see* 4 Blackstone, Commentaries *225; *see also* General Laws of Oregon 1845-1864 § 544, 535 (Deady 1865) (defining burglary as, *inter alia,* the breaking and entering of "any building within the curtilage of any dwelling house," with intent to commit a felony therein). Moreover, as Blackstone elsewhere noted, a breaking and entering that was not a burglary might still qualify as a trespass. 4 Blackstone, Commentaries, *227.

Neither does Blackstone's separate chapter on the tort of trespass to land distinguish between the curtilage of a dwelling and other land:

> "Every unwarrantable entry on another's soil the law entitles a trespass *by breaking his close;* the words of the writ of trespass commanding the defendant to show cause *quare clausum querentis fregit.* For every man's land is in the eye of the law inclosed [sic] and set apart from his neighbor's: and that either by a visible and material fence, as one field is divided from another by a hedge, or by an ideal invisible boundary, existing only in the contemplation of law, as when one man's land adjoins to another's in the same field."

3 Blackstone, Commentaries *209-*210 (emphasis in original).

■ The rationale underlying the curtilage concept as it was used at common law — to provide a zone of protection to sleeping residents from the "midnight terror" of burglary — simply is not the same as the rationale underlying Article I, section 9, or, for that matter, the Fourth Amendment, each of which protects the privacy of the individual from warrantless invasion and scrutiny by the government and its minions. Reliance on the common-law concept of curtilage to justify excluding land outside the curtilage from the protections of either constitutional provision is misplaced.

*3. The argument based on the uses to which land outside the curtilage of a dwelling is put.*

■    This argument by the state is of questionable signifi-
cance under our state constitutional analysis, because it turns
on whether the occupants of such land have a "reasonable
expectation of privacy" in it. Under Article I, section 9, how-
ever, the question is whether governmental intrusions into
privately owned land would significantly impair an indi-
vidual's interest in freedom from scrutiny, *i.e.,* his privacy.
The answer is: That depends.

Areas such as "the vast expanse of some western
ranches or * * * the undeveloped woods of the Northwest"
described by the *Oliver* majority, 466 US at 179 n 10, may
involve little or no privacy interest. Some areas of this state
contain large unmarked tracts of land in which it is difficult to
tell where one piece of property ends and another begins. The
public may be in the habit of using these areas to hike, fish,
hunt or camp. However lonely a person usually may be in such
places, he or she has no true privacy in them.

On the other hand, owners of even large tracts may,
at some expense, take steps to keep out intruders. In this
society, signs, such as "No Trespassing" signs, the erection of
high, sturdy fences and other, similar measures are all indica-
tions that the possessor wishes to have his privacy respected.
Allowing the police to intrude into private land, regardless of
the steps taken by its occupant to keep it private, would be a
significant limitation on the occupant's freedom from govern-
mental scrutiny. Article I, section 9, does not permit such
freewheeling official conduct. The remaining question is
whether it is possible to fashion a workable test to enable the
police to determine whether a particular intrusion constitutes
a search under the state constitution. It is.

### 4.   *Case-by-case analysis.*

■■    The rule we announce today is simple and objective.
An individual's privacy interest in land he or she has left
unimproved and unbounded is not sufficient to trigger the
protections of Article I, section 9. Thus, it is not sufficient that
the property in question is privately owned, or that it is
shielded from view by vegetation or topographical barriers,
because those features do not necessarily indicate the owner's
intention that the property be kept private. A person who
wishes to preserve a constitutionally protected privacy inter-
est in land outside the curtilage must manifest an intention to

exclude the public by erecting barriers to entry, such as fences, or by posting signs. This rule will not unduly hamper law enforcement officers in their attempts to curtail the manufacture of and trafficking in illegal drugs, because it does not require investigating officers to draw any deduction other than that required of the general public: if land is fenced, posted or otherwise closed off, one does not enter it without permission or, in the officers' situation, permission or a warrant.

■   In the present case, the defendants (or someone) had blocked access to their property with cables and posted "No Hunting" signs. However, on this record there was no objective reason for the officers to believe that, in addition to the restriction on hunting, other uses such as hiking were forbidden. In this state, with its expanses of rough and open country, hiking, camping and the like commonly occur on land that is owned by large companies and individuals. See, generally, ORS 105.655-.680, dealing with public recreational use of private lands. Unless they intended to hunt, neither the officers nor anyone else would have understood the posted signs to be intended to exclude them from the property entirely. The state carried its burden of showing that there was no violation of the Oregon Constitution in the officer's actions.[6] The Court of Appeals' conclusion to the contrary was erroneous.

The decision of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

---

[6] Our holding that the officers' actions were objectively reasonable is based on this record. It is possible that, in some other context, a defendant might show that the local custom was to treat signs of apparently limited applicability ("No Hunting") as the equivalent of signs of general proscription ("No Trespassing"). Defendants made no such argument here.