Submitted on record and briefs December 14, 2007,
reversed and remanded April 16, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# ROBERT LYNN FOSTER,
*Defendant-Appellant.*

Benton County Circuit Court
CM0520170; A129929

182 P3d 262

Jay Edwards filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Douglas F. Zier, Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Sercombe, Judges.

EDMONDS, P. J.

▬

## EDMONDS, P. J.

■    Defendant appeals a judgment of conviction for possession of a controlled substance, *former* ORS 475.992(4)(b) (2003), *amended by* Or Laws 2005, ch 708, § 39, *renumbered as* ORS 475.840(3)(b) (2005). He assigns error to the trial court's denial of his motion to suppress evidence obtained during the service of a restraining order and asserts that the evidence was obtained as a result of an illegal search in violation of Article I, section 9, of the Oregon Constitution[1] and the Fourth Amendment to the United States Constitution.[2] We review the legality of searches and seizures for errors of law, but we defer to the trial court's findings of historical fact so long as there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We reverse and remand.

We take the following facts from the record. Four deputies from the Benton County Sheriff's Office, including Deputy Hardison and Deputy Moody, went to defendant's residence at approximately 11:30 p.m. to serve an occupant with a restraining order. Defendant's residence is at the top of a long, uphill, gravel driveway. To the right of the driveway is a garage. Behind the garage lies defendant's residence, which is a rectangular mobile home. The driveway, garage, and residence form an upside-down L shape.

Four deputies were dispatched to defendant's residence for "officer safety concerns" based on the sheriff's

---

[1] Article I, section 9, provides as follows:

*"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure;* and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

(Emphasis added.)

[2] The Fourth Amendment to the United States Constitution provides as follows:

*"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,* and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

(Emphasis added.)

department's prior visits to that location. Hardison had been to the property "numerous times over the years" where he had seen "fully automatic weapons" and had been in "physical fights" and "vehicle chases" with people resisting arrest. In addition, Moody had been involved in two prior incidents where he had been required to use physical force against the occupants of the residence and had recovered firearms from them.

When the deputies arrived at defendant's address, they split up and surrounded the residence. At trial, Moody explained why the four deputies took up positions around the residence:

> "[W]e wanted to make sure that we didn't have people running out of the back [of the residence] and people circling around on us, as well as keeping an eye on the residen[ts] inside the house as we went to the house to serve the restraining order."

Hardison took up a position outside defendant's bedroom window along the front of the residence, approximately 20 feet to the right of the front entrance—away from the driveway and garage. The area outside defendant's bedroom window is not on a path to the garage, driveway, front door, or back door. The window was covered with horizontal blinds, and the bedroom was lit from within. Hardison was standing "right at the window to look in." The bottom of the window was level with Hardison's eyes, approximately six feet above the ground. Hardison watched defendant enter the bedroom and put methamphetamine into a pipe. At trial, Hardison explained that, in his experience, the type of pipe defendant was handling was associated with methamphetamine use. After watching defendant put methamphetamine into the pipe, Hardison entered the residence, went to defendant's bedroom, and arrested him for possession of methamphetamine.

Before trial, defendant filed a motion to suppress "any evidence obtained directly or indirectly as a result of a violation of Defendant's constitutional rights." After holding a hearing on defendant's motion to suppress, the trial court denied the motion, finding as follows:

"The deputies were familiar with the residence and the persons they expected to find therein based upon numerous prior contacts. The deputies had a reasonable, good faith concern for officer safety. Furthermore, the deputies were aware that the occupants of the residence used the back door as frequently as the front door to enter and exit the residence. For reasons of officer safety and to secure the back door, the four deputies took up positions surrounding the property before contacting the occupants.

"While standing at a window located approximately 20 feet from the front door of the residence, Deputy Hardison observed the Defendant through an open window as he removed a plastic baggie containing what appeared to be methamphetamine from a pair of pants that had been lying on the floor, load what appeared to be methamphetamine into a glass pipe, and then return the plastic baggie to the pants pocket. * * *

"* * * * *

"The deputies were lawfully on the premises. Deputy Hardison had taken up a position near the front door for officer safety reasons. Deputy Hardison was able to see through the window and into the room without the aid of a flashlight or other visual enhancement aid. The observations made by Deputy Hardison were in open view and amounted to probable cause for which he could arrest the Defendant after a valid search.

"* * * * *

"Defendant's Motion to Suppress is denied."

After the trial court denied defendant's motion to suppress, defendant entered a conditional guilty plea pursuant to ORS 135.335(3),[3] reserving his right to appeal the trial court's denial of the motion to suppress. In accordance with the plea, the trial court entered a judgment of conviction for possession of a controlled substance, *former* ORS 475.992(4)(b) (2003).

---

[3] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

On appeal, defendant reasserts his argument that Hardison's observations through the bedroom window at 11:30 p.m. constituted an illegal search in violation of defendant's right to privacy under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. Because we conclude that defendant's right to privacy was violated under Article I, section 9, we do not consider the federal constitutional question. *State v. Kennedy*, 295 Or 260, 262-65, 666 P2d 1316 (1983).

■ Article I, section 9, protects against unreasonable searches and seizures. *State v. Campbell*, 306 Or 157, 163, 759 P2d 1040 (1988). "A 'search' occurs when a person's privacy interests are invaded." *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). We apply an objective test to determine whether a search occurred by asking whether the state's conduct significantly impairs "an individual's interest in freedom from scrutiny[.]" *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). To determine whether state conduct constitutes a search, we consider "whether a private individual would offend social and legal norms of behavior by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).

■ Oregon's constitutional protections of a person's privacy interests are "particularly pertinent when it involves a person's home," *State v. Fortmeyer/Palmer*, 178 Or App 485, 488, 37 P3d 223 (2001), because the home is the "quintessential domain protected by the constitutional guarantee against warrantless searches," *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983). People have a privacy interest in the immediate area around their home that they exercise control over, and a law enforcement officer's entry into that area, without consent, violates that privacy interest. *State v. Breshears/Oliver*, 98 Or App 105, 111, 779 P2d 158 (1989). However, a person's right to privacy is not absolute; a person gives up his or her right to privacy, even though that person is in a protected area, by engaging in conduct that can be plainly observed from a lawful vantage point without any special effort. *See Louis*, 296 Or at 61. Thus, no search occurs when a police officer makes an "unaided observation" from a "lawful vantage point." *State v. Ainsworth*, 310 Or 613, 617,

801 P2d 749 (1990). But information collected from an unlawful vantage point may not be used to provide the probable cause needed to support the exigent circumstances exception to the warrant requirement in Article I, section 9. *See State v. Hitesman*, 113 Or App 356, 360, 833 P2d 306, *rev den*, 314 Or 574 (1992); *State v. Jackson*, 71 Or App 76, 79-80, 691 P2d 130 (1984).

The issue is whether Hardison's observations occurred from a lawful vantage point. Initially, we note that it was lawful for the deputies to approach the front door to serve the restraining order on an occupant of the residence. In *State v. Gabbard*, 129 Or App 122, 128, 877 P2d 1217 (1994), we stated that "[a]n officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant." That consent, however, is limited. In *Portrey*, we explained that

> "[o]ne may expect that visitors will stand on the front porch for purpose of engaging in conversation, but that does not mean that it is expected that visitors will pick up items on the front porch and examine what is not in view. By impliedly consenting to one form of intrusion, an occupant does not necessarily consent to being subjected to other forms of scrutiny as well."

134 Or App at 465.

As explained above, people have a privacy interest in the immediate area around their residence over which they exercise control. The area immediately outside defendant's bedroom window is such an area. As a resident of the premises, defendant exercised joint control over that area and was entitled to exclude members of the public from it. Indeed, the area outside defendant's bedroom window is not on a path to the garage, driveway, front door, or back door, and it is 20 feet away from the front door. Moreover, Hardison had to walk past the front door in order to position himself where he could see in the window.

Our reasoning in *Jackson* helps to inform the analysis. In *Jackson*, an informant told deputies that he had seen marijuana plants growing in pots behind the defendant's residence. 71 Or App at 78. The deputies, after concluding that

they lacked probable cause to obtain a warrant, drove to the defendant's house intending to request his consent to search. *Id.* After knocking on the defendant's front door and receiving no answer, a deputy walked around the corner of the house and saw a marijuana plant. *Id.* at 78-79. We concluded that the officer's vantage point exceeded the scope of implied consent and was unlawful:

> "We do not agree that the deputy saw the marijuana from a legal vantage point. The trial court did not rule that the plant in the side yard was visible from the porch, driveway or road, nor does the state contend that the plant was visible from any point less private than the southwest corner of defendant's house. Although in *State v. Ohling,* [70 Or App 249, 688 P2d 1384 (1984),] the officers had to walk around to the back of the house to see the marijuana plants, the rationale of that decision is that, in so doing, they left the area in which consent to the presence of strangers is implied. There was no *implied consent* in this case to the deputy's leaving the front porch and walking to the corner of the house next to the side yard."

*Id.* at 79 (emphasis added).

■ Nonetheless, the state argues that defendant had no privacy interest in the area outside his bedroom window because the officers were legally at the residence to serve a restraining order. It asserts that the trial court correctly concluded that Hardison was legally entitled to take up a position outside defendant's bedroom window because of the history of the residence, the fact that the occupants of the residence had repeatedly resisted arrest, and the fact that automatic weapons had been found at the residence.

The officer-safety doctrine, which applies to officer-citizen encounters, creates an exception to the warrant requirement of Article I, section 9, in some situations. In *State v. Bates,* 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court explained that, in the context of a vehicle stop, "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, *based upon specific and articulable facts*, that the citizen might pose an immediate threat of serious physical injury to the officer or to

others then present." (Emphasis added.) However, our research does not disclose a case under Article I, section 9, in which the officer-safety doctrine has been extended to permit the invasion of the curtilage of a residence beyond the boundaries of driveways or pathways to an exterior door, areas that would ordinarily be used by a member of the public visiting the house.[4] We need not decide whether the officer-safety doctrine extends to the circumstances of this case, because, even if it did, the state failed to meet its burden under the doctrine. Specifically, the state failed to identify sufficient, articulable facts to show that officer-safety concerns required Deputy Hardison to position himself 20 feet away from the front door, immediately next to defendant's bedroom window, at a location that is not on a path to the front door, back door, garage, or driveway as distinguished from a different location that could ensure officer safety. Therefore, even if the doctrine were applicable, the state's argument would fail for that reason.

■    We conclude therefore that Hardison's action of standing "right at the window to look in" defendant's bedroom window at 11:30 p.m., if undertaken by a private individual, would "offend social and legal norms of behavior." *Portrey*, 134 Or App at 464. As explained above, the home is the "quintessential domain protected by the constitutional guarantee against warrantless searches." *Louis*, 296 Or at 60. In other words, it would not be socially acceptable for a private process server, in the course of serving an occupant, to walk up to a person's bedroom window at 11:30 p.m. and look in. It follows that neither is it socially acceptable for a

---

[4] The state relies on *State v. Illingworth*, 60 Or App 150, 652 P2d 834 (1982). In that case, the officers who approached the defendants' house were concerned that one of the defendants might assault them with a handgun. Approaching the residence cautiously, one of the officers walked from the driveway of the residence toward its back door. While en route, he looked through a large kitchen window to see if anyone was watching him. While standing at a distance of four to five feet from the house, he saw through the window, a small pot with marijuana plants in it. We held that under the "plain view" doctrine under the federal constitution, the officer made his observation from a place where he "had a right to be." 60 Or App at 154. In contrast to the circumstances in *Illingworth*, there are no circumstances in this case that permit the conclusion that the occupants of defendant's residence had impliedly consented to Deputy Hardison standing underneath defendant's bedroom window, because that location is outside the pathways to any entrance to the residence.

law enforcement officer to engage in similar conduct. Thus, Hardison's observations constituted an unlawful search in violation of Article I, section 9, and do not provide the probable cause needed to support the exigent circumstances exception to the warrant requirement.

Reversed and remanded.