Argued and submitted May 12, decision of Court of Appeals reversed; judgment of circuit court affirmed September 17, 2009

# STATE OF OREGON,
*Petitioner on Review,*

*v.*

# ROBERT LYNN FOSTER,
*Respondent on Review.*

## (CC CM0520170; CA A129929; SC S056299)

217 P3d 168

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Bronson D. James, Chief Deputy Defender, Salem, argued the cause and filed the brief for respondent on review. With him on the brief was Peter Gartlan, Chief Deputy Public Defender, Appellate Division, Office of Public Defender Services.

GILLETTE, J.

## GILLETTE, J.

In this criminal case, we are asked to consider whether evidence seized as a result of observations by an officer who looked into an open, lighted window of a residence at night, before serving a restraining order at that residence, should be suppressed under either the state or federal constitutional prohibitions against unreasonable searches and seizures. The trial court refused to do so, concluding, on the facts of this case, that the actions of the officer were justified by officer safety concerns. The Court of Appeals disagreed and held that the evidence should have been suppressed. *State v. Foster*, 219 Or App 276, 182 P3d 262 (2008). We allowed the state's petition for review and now reverse the decision of the Court of Appeals.

We take the following facts from the trial court record and the findings of the trial court. *See State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993) ("A trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings.").

The Benton County Sheriff's Office was engaged to serve a restraining order on Aaron Mathews Spinney. On Saturday, January 15, 2004, the Sheriff's Office received information that Spinney was staying at defendant's residence near Philomath. Both defendant and his residence were well known to the members of the Sheriff's Office. Deputy Hardison, one of the officers sent to serve the restraining order, stated that he had been to the residence "numerous times"—"I couldn't even begin to tell you how many times I've been to th[at] residence." In Hardison's experience, the number of people at the residence at any particular time varied from two to as many as 10 or more. On several occasions, persons at the residence had fled the police. On at least two occasions, deputies had been required to use force and fight with people at the residence. Defendant and his father (who also lived in the residence) had both been known to have weapons in the past. Firearms had been recovered from the residence, and Hardison had seen a fully automatic

weapon that the police had seized there. According to Hardison, because of past problems with people at the residence, "[i]t's usually four or more [deputies] go up there."

In this case, it was four deputies. They arrived at approximately 11:35 p.m.[1] According to Hardison, when the deputies arrived they were deployed to meet two concerns:

> "[W]e wanted to make sure that we didn't have people running out of the back and people circling around on us, as well as keeping an eye on the residen[ts] inside the house * * *."

One deputy went up the path to the front door, while another deputy was sent around to the back door. Hardison went 20 feet past the front door to look into a lighted bedroom window. In looking in, Hardison stood in a flower or dirt bed directly beneath the window. The window was open, and Hardison did not use any device to help him look inside.[2]

Almost immediately after first looking in the window, Hardison saw defendant enter the room, remove an off-white substance from a sandwich bag, and place it into a pipe. Based on his training and experience, Hardison believed that defendant was loading methamphetamine into the pipe. From prior contacts, Hardison was aware that defendant had used methamphetamine. Hardison reported what he had seen to the officer in charge at approximately the same time that Spinney came out of the residence to be served with the restraining order. The deputies were concerned that defendant would destroy the drugs, either by consuming them or by flushing them down the toilet. Hardison then entered the residence, arrested defendant, and seized the bag, the pipe, and a set of scales.

---

[1] The reason that the officers chose that hour is not altogether clear. Obvious reasons include the greater likelihood that the man they sought would be there, as well as the value of darkness in concealing the officers' approach.

[2] The trial court concluded that the window was open. Hardison testified that there were horizontal blinds on the window, but he did not testify that the blinds were down or closed, and his other statements implied that the blinds either were up or open. Thus, the trial court's inferentially based conclusion was a permissible one.

Defendant was indicted for unlawful possession of a controlled substance (methamphetamine). He moved to suppress the evidence that Hardison had seized as having been obtained in violation of his state and federal constitutional rights to be secure from unreasonable searches and seizures. The trial court held a hearing and, on July 11, 2005, sent a letter to the parties setting out its findings of fact and conclusions of law. Although the trial court agreed that defendant had a privacy interest in the curtilage of the residence,[3] the court nonetheless concluded that Hardison had taken up the position near the window for valid officer safety reasons and that the evidence that Hardison saw and later seized was in plain view from that position. The trial court therefore denied defendant's motion to suppress.

Defendant subsequently entered a conditional guilty plea, reserving the right to appeal the trial court's ruling on the motion to suppress. *See* ORS 135.335(3) (authorizing such a procedure). The trial court entered a judgment of conviction and sentence. Defendant appealed.

As noted, the Court of Appeals reversed and remanded, concluding that Hardison's observations through the window constituted an illegal search under Article I, section 9, of the Oregon Constitution. The court began its analysis by noting that the privacy protections of the Oregon Constitution are particularly applicable to a person's home and the area immediately surrounding it. *Foster*, 219 Or App at 281. The court noted, however, that there would be no search if "a police officer makes an 'unaided observation' from a 'lawful vantage point.'" *Id.* at 281 (quoting *State v. Ainsworth*, 310 Or 613, 617, 801 P2d 749 (1990)). The issue thus was whether Hardison was at a lawful vantage point when he looked in the window. The Court of Appeals concluded that the deputies could approach the front door, because there was an implied consent for visitors to contact the residents of a house in that way. Hardison's viewpoint, however, was not from the driveway or from a path to the

---

[3] " '[T]he common-law distinguished "open fields" from the "curtilage," the land immediately surrounding and associated with the home.' " *State v. Dixson/Digby*, 307 Or 195, 209, 766 P2d 1015 (1988) (quoting *Oliver v. United States*, 466 US 170, 180, 104 S Ct 1735, 80 L Ed 2d 214 (1984)).

front or back door. Indeed, Hardison had walked past the front door to look in the window. *Id.* at 282.

The state argued to the Court of Appeals that "officer safety" concerns permitted Hardison to position himself outside the window.[4] The Court of Appeals assumed, for purposes of argument, that the officer safety doctrine could extend to "the invasion of the curtilage of a residence beyond the boundaries of driveways or pathways to an exterior door," *id.* at 284, but nevertheless concluded that the state had failed to meet its burden of proof under the doctrine. That was so because it had

> "failed to identify sufficient, articulable facts to show that officer-safety concerns required Deputy Hardison to position himself 20 feet away from the front door, immediately next to defendant's bedroom window, at a location that is not on a path to the front door, back door, garage, or driveway *as distinguished from a different location that could ensure officer safety.*"

*Id.* at 284 (emphasis added). Having determined that Hardison had not been standing at a lawful vantage point when he observed defendant's conduct, the Court of Appeals concluded that Hardison's observations were an unconstitutional search under Article I, section 9, and therefore reversed defendant's conviction. *Id.* at 284-85. As noted, we allowed the state's petition for review.

On review, the state asserts that Deputy Hardison's act of positioning himself under, and looking into, the window fell within the officer safety doctrine and, thus, did not violate Article I, section 9, of the Oregon Constitution. The state contends that the Court of Appeals applied the officer safety doctrine in too narrow a fashion. For his part, defendant contends that Court of Appeals correctly held that the evidence must be suppressed under Article I, section 9. Alternatively, defendant argues that the evidence should be suppressed under the Fourth Amendment to the United States Constitution.

---

[4] We describe the "officer safety" doctrine at considerable length later in this opinion. 347 Or at 7-8.

We begin our analysis under the state constitution. Article I, section 9, of the Oregon Constitution provides, in part:

> "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

This court has held that certain actions taken by police officers to protect the safety of the officers (or others present) do not violate Article I, section 9. The most comprehensive discussion of the officer safety doctrine is found in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). Although the facts in *Bates* do not parallel those in this case, an explanation of the officer safety doctrine that this court identified in *Bates* will illuminate our analysis here. We therefore discuss *Bates* in some detail.

In *Bates*, an officer had stopped the defendant's car for excessive emissions. It was night, the stop occurred in a "high crime" area, and the car had out-of-state license plates. When officers approached the car, they saw that it contained a television and a videocassette recorder. One of the officers noticed an object on the floorboard between the defendant's feet; he could not identify it, so he asked the defendant to pull it out. The defendant did not pull the object out, but instead reached under the seat and remained in that position. The officer drew his service revolver, ordered the defendant from the car, and pulled a closed black bag from under the seat. On opening the bag, the officer discovered drugs (among other things). *Id.* at 521-22. In the defendant's subsequent prosecution on drug and weapons charges, the trial court rejected a defense motion to suppress the evidence obtained from the search of the bag. In its review of that ruling, this court considered whether the warrantless search was justified by officer safety concerns.

The *Bates* court began its analysis by observing that, generally, officers are entitled to take reasonably necessary steps to protect their safety during an encounter with a citizen, provided certain requirements are met. Specifically, the court held that:

"Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*Id.* at 524. This court added that police must be given some discretion in the officer safety context:

"[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Id.* at 524-25.

Under the facts found in *Bates,* however, the court concluded that the requirements of the officer safety doctrine had not been met. The officer had identified five facts that caused him to be concerned for his safety: the out-of-state license plates, the time of day, the high crime area, the defendant's appearance, and the presence of a videocassette recorder and television on the back seat of the vehicle. *Id.* at 525. The court concluded that none of those facts "either individually or collectively justified a suspicion on [the officer's] part that this defendant posed an immediate threat [of physical harm]." *Id.* at 526.

The court separately addressed whether the bag under the driver's seat justified the officer's conclusion that the defendant was such a threat and concluded that it did not: "In light of defendant's cooperative attitude, his lack of aggressive or threatening behavior[,] and the absence of any apparent weapon, the mere possibility that he might have committed a crime and the presence of what appeared to be a bag are not sufficient." *Id.* at 527. The court explained that, although police officers "are entitled to some leeway in taking

protective measures," the facts articulated by the officer were not sufficient to show a reasonable belief that the defendant was an immediate threat, and the motion to suppress the evidence should have been granted. *Id.*

But the facts in *Bates* are not the facts here. In *Bates*, the circumstances that aroused the officer's concerns occurred "during the course of a lawful encounter with a citizen." *Id.* at 524. In the present case, the pertinent facts all were historical, *i.e.*, they all were known *before* the officers' encounter. But, in our view, the timing of the officer's knowledge is not the point of invoking the officer safety doctrine. Instead, it is sufficient that the officers be able to point to specific and articulable facts—whether historical or contemporaneous—that would reasonably create a fear for the safety of the officers or others from an imminent threat to them of serious physical injury.[5]

■ We have summarized the pertinent facts above. Deputies had been to this residence repeatedly. The residence sometimes had 10 or more occupants. In some past visits, persons at the residence had used force to fight the deputies. Defendant and his father had both been known to have weapons; firearms had been recovered from the residence; and a fully automatic weapon had been seized at the residence. Those are specific, articulable facts. The next question is whether those facts would justify the required reasonable suspicion of an immediate threat to the officers during the anticipated encounter with the occupants.

Defendant contends that the foregoing facts are "stale," because the state's witnesses did not give the dates of

---

[5] We note in passing that the Court of Appeals analyzed the case as if the only privilege that the deputies had to enter into the property was one of implied consent for the public to go to the front door. That, however, does not exhaust the potentially applicable privileges to engage in what would otherwise be a trespass. "Where one is privileged to execute civil process on the person * * * of another, one is also privileged to enter the other's land, by force if necessary, to serve the process." 1 Fowler V. Harper, Fleming James, Jr., and Oscar S. Gray, *Harper, James and Gray on Torts* § 1.19, at 75 (2006) (footnote omitted); *see Restatement (Second) of Torts* §§ 208, 209 (1965) (discussing requirements of the privilege). In Oregon, a sheriff is required to serve court orders. ORS 206.030. If resistance is anticipated, the sheriff may even command others to assist in overcoming the resistance. ORS 206.050. On the other hand, the privilege of entry to serve civil process does not necessarily permit the server to roam at will across the property.

the prior incidents. That is, defendant contends that the other incidents on which Hardison relied may have been so remote in time that it was not reasonable to rely on them as showing that occupants of the residence might pose an immediate threat of serious physical injury. We disagree. Here, the evidence concerned the tendency of the occupants of the house to be prepared to, or to actually, resort to violence. Information about the presence of a small amount of contraband at a given place (to use but one example) may grow stale, *see, e.g., State v. Ingram*, 251 Or 324, 445 P2d 503 (1968) (magistrate could not find probable cause to search residence for narcotics based solely on fact that heroin had been obtained from residence one month before application for search warrant was filed), but human tendencies have a longer shelf life. Moreover, and even if "staleness" were the pertinent inquiry, the state did offer evidence establishing at least the outer boundary of when the incidents occurred: Hardison testified that he had been with the sheriff's office for six years. That fact, coupled with Hardison's testimony that he had been to the residence "many times," showed that the residence and the people residing in it had a history that a reasonable officer would believe still was applicable. Given that history of violence and of weaponry on the premises and in the hands of the occupants, we conclude that the deputies had a reasonable suspicion that the occupants of the residence posed an immediate threat of serious physical injury.

We turn to the next part of the officer safety doctrine, *viz.,* "whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Bates*, 304 Or at 525. As noted, this court, in evaluating the reasonableness of a particular officer safety decision, will not "uncharitably second-guess" on-the-spot choices of persons who must make difficult decisions under great pressure, often with little or no time for reflection. *Id.* at 524.

In this case, the deputies had a reasonable suspicion that they were about to encounter circumstances in which (1) there might be as many as 10 occupants of the residence, (2) those occupants might be armed, and (3) the occupants might be willing to use force against the deputies. There was

an open, lighted window some 20 feet past the front door; Hardison went to look through that window in order to "keep[ ] an eye on the residen[ts] inside the house" while the deputies served the restraining order. By doing so, Hardison would have been able to warn the other deputies if an occupant either was armed or had begun arming himself when the deputies knocked. Under those circumstances, we agree with the trial court that Hardison's actions were within the range of reasonable precautions that the officers were entitled to take against the anticipated threat.

The Court of Appeals appears to have reached a contrary conclusion because it applied a more demanding test to the deputies' actions. The issue, that court stated, was whether the state had "identif[ied] sufficient, articulable facts to show that officer-safety concerns *required Deputy Hardison to position himself [where he did,] * * * as distinguished from a different location that could ensure officer safety*." *Foster*, 219 Or App at 284 (emphasis added). That test misreads both the officer safety doctrine and *Bates*, which explained the doctrine. The requirement of specific, articulable facts relates only to whether an officer reasonably suspected an immediate threat. *See Bates*, 304 Or at 524 ("a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury"). Beyond that, the doctrine asks only whether safety precautions chosen by the officer were reasonable under the perceived circumstances. The state is not required, as the Court of Appeals suggested, to justify the choice of one reasonable precaution over another. Indeed, such a *post hoc* weighing of alternatives would be exactly the sort of uncharitable second-guessing that *Bates* itself condemned: It would require that an option that was chosen quickly and under pressure be the same one that a reviewer later identifies at leisure and after reflection. Courts should not weigh the possible courses of action against each other; the officer safety doctrine requires only that the choice actually made be reasonable, even if other choices also would have been reasonable.

Defendant argues that we should extend to this case the rule of *State v. Davis*, 295 Or 227, 666 P2d 802 (1983). In

*Davis*—an officer safety case predating *Bates*—this court held that police officers' concerns for their safety did not justify their entry into a defendant's motel room:

> "[A] remote possibility of harm to the police officers cannot justify a warrantless entry into the private recesses of one's house. Absent articulable facts that evidence a compelling and urgent need for the entry, the Oregon Constitution demands a warrant be issued. We can require no less where the entry, as here, is supported with less than probable cause."

*Id.* at 243. Defendant contends that we should apply the "compelling and urgent need" requirement to the curtilage of a house as well as to the "private recesses."

We decline to do so. There is a significant difference between crossing an open yard at the edge of a path that is open to the public and leads to a residence, and breaching the physical boundary established by the walls and doors of a residence. We conclude that *Davis* merely represents a particular, and correct, application of the officer safety doctrine that we later articulated more thoroughly in *Bates*. The doctrine generally requires that an officer's response to officer safety concerns be reasonable in light of the specifically articulated and reasonably perceived circumstances. *Davis* speaks to the reasonableness of one particular type of officer safety response—holding that a warrantless entry into the interior of a residence is not a reasonable response unless "articulable facts * * * evidence a compelling and urgent need for the entry." *Id.* We perceive no conflict between the rule of *Davis* and the officer's actions here.

We conclude that the officer safety doctrine applied in this case. Under the totality of the circumstances, Deputy Hardison did not violate Article I, section 9, of the Oregon Constitution when he looked through the open window of the residence.

Defendant argues in the alternative that the officers, even if they properly observed his illegal activity through the window, should not have entered his house without a warrant. Defendant does not appear to have made that argument either to the trial court (where he lost), or to the Court of Appeals (where he won). We therefore decline to address it.

Defendant also argues that Hardison's actions violated the Fourth Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment. The Fourth Amendment provides, in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *."

The United States Supreme Court, however, has recognized an officer safety doctrine similar to the one that we articulated in *Bates*. In a line of cases dating back to *Terry v. Ohio*, 392 Or 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968), the Court has concluded that police may perform limited searches necessary for officer safety when the officers have specific and articulable facts to support a reasonable suspicion of danger to themselves or others. *See, e.g., Richards v. Wisconsin*, 520 US 385, 394, 117 S Ct 1416, 137 L Ed 2d 615 (1997) (officers may conduct a "no-knock" entry pursuant to warrant if they "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous"); *Maryland v. Buie*, 494 US 325, 327, 110 S Ct 1093, 108 L Ed 2d 276 (1990) (officers may conduct a protective sweep of residence after arrest "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others") (alterations, internal quotation marks, and citations omitted).

The situation here is analogous to the circumstances addressed in *Terry* and its progeny. For the reasons that we already have discussed, we conclude that the state has offered specific and articulable facts why the deputies here reasonably feared for their safety. We further conclude that walking 20 feet past the front door of defendant's house to look in an open, lighted window was a reasonable response to the perceived danger. It follows that the deputies' actions did not violate the Fourth Amendment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.