Argued and submitted June 6; decision of Court of Appeals reversed, judgment of Beaverton Municipal Court reversed, and case remanded to that court for further proceedings consistent with this opinion November 7, 2019

STATE OF OREGON,
*Respondent on Review,*

*v.*

ERIC LAWRENCE KREIS,
*Petitioner on Review.*

(M-808542-2) (CA A157224) (SC S066329)

451 P3d 954

Defendant, who was charged with interfering with a peace officer for refusing to obey a "lawful order" under ORS 162.247(1)(b), moved for a judgment of acquittal, arguing that the officer's order, which directed defendant to turn around so that he could be handcuffed, was not a "lawful order" because it was issued in violation of Article I, section 9, of the Oregon Constitution. The trial court denied defendant's motion, a jury convicted defendant of interfering with a peace officer, and the Court of Appeals affirmed. *Held*: An order that effects a seizure is not a "lawful order" for purposes of ORS 162.247(1)(b) if it is issued in violation of Article I, section 9, and in this case, the officer's order was issued in violation of Article I, section 9, because the officer lacked reasonable suspicion that defendant was committing or about to commit a crime, and the officer's safety concerns did not provide an independent constitutional justification for the order.

The decision of the Court of Appeals is reversed. The judgment of the Beaverton Municipal Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

En Banc

On review from the Court of Appeals.*

Marc D. Brown, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Christopher A. Perdue, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* On appeal from Beaverton Municipal Court, Les Rink, Judge. 294 Or App 554, 432 P3d 245 (2018).

WALTERS, C. J.

The decision of the Court of Appeals is reversed. The judgment of the Beaverton Municipal Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

Balmer, J., dissented and filed an opinion, in which Garrett, J., joined.

## WALTERS, C. J.

In this criminal case, an officer seized defendant without a constitutional basis for doing so, and, to effectuate that unconstitutional stop, ordered him to turn and be handcuffed. Defendant refused and was convicted, under ORS 162.247(1)(b), of interfering with a peace officer for refusing to obey a "lawful order." For the reasons that follow, we conclude that the officer's order was not a "lawful order" as that term is used in ORS 162.247(1)(b) and reverse defendant's conviction.

## I. BACKGROUND

Because defendant was convicted of the offense of interfering with a peace officer, we state the facts that gave rise to that charge in the light most favorable to the state. *See State v. Lupoli*, 348 Or 346, 366, 234 P3d 117 (2010) (stating standard). Two officers, Crino and Mendez, were in their patrol car when they saw defendant in a restaurant parking lot around midnight. The restaurant had been closed for about 20 minutes, and the parking lot, which provided parking for the restaurant and a nearby golf course, had recently been the site of several thefts. Defendant was standing "near" one of the approximately five cars in the lot, and the officers suspected that defendant might be trying to break into that car or might be attempting to commit DUII. To investigate, Crino ran the car's license plate and noted that defendant matched the description of the car's registered owner. However, believing that the descriptions of registered owners are not always accurate, Crino remained unsure whether defendant owned the car. While Crino was running the car's plates, Mendez, an officer-in-training, approached defendant and initiated a conversation. Defendant did not provide any information in response to Mendez's questions; instead, he left the parking lot and walked toward a paved pathway leading to the back of the restaurant.

Crino and Mendez followed defendant and caught up with him as he stood on the restaurant's back patio near the restaurant's back door. Crino asked defendant for his name, whether the car that he had been standing near was his, and whether he was a restaurant employee. Defendant

did not respond, and when he took a few steps away from the officers, Crino informed him that he was not free to leave until the investigation was complete. Defendant responded that he did not "have to talk to" Crino and that he "was not answering any of [his] questions." To Crino, defendant appeared angry and exhibited signs of intoxication. Considering Mendez's lack of experience, Crino called for assistance.

When two additional officers arrived, Crino explained to defendant that Crino needed to learn defendant's identity, why he was at the restaurant, and whether he was a restaurant employee. Defendant's brow furrowed, he balled his hands into fists, took a bladed stance, and began shifting his weight back and forth. Crino noticed that defendant was looking at him and the other officers, while also looking beyond them as if he were looking for an escape route. Crino told defendant that, if defendant did not provide the requested information, he would be arrested. In response, defendant stated through clenched teeth, "I am not going to be arrested." At that point, Crino explained to defendant that he had concern for his safety and ordered defendant to turn around, face the building, and put his hands behind his back so that he could be handcuffed. Defendant refused. Crino gave the order a second time, again explaining to defendant that he was going to be handcuffed for safety reasons. Defendant said, "No," and refused to turn around. Crino told defendant that he was under arrest "for interfering." Defendant physically resisted the officers' attempts to subdue him, and the officers took him to the ground and handcuffed him.

The state charged defendant with interfering with a peace officer under ORS 162.247(1)(b) and with resisting arrest. The case went to trial before a jury. After the state presented its case, defendant moved for judgment of acquittal on the interfering charge. Defendant argued that Crino did not have reasonable suspicion that defendant had committed, or was about to commit, a criminal offense, and consequently, that neither his stop of defendant nor his order that defendant turn around to be handcuffed were lawful. The state responded with two arguments. First, it asserted that Crino had reasonable suspicion that defendant had

committed or was about to commit DUII, attempted DUII, or theft. Second, and alternatively, the state asserted that, even if Crino's stop was not lawful, his order that defendant turn and be handcuffed was justified by reasonable officer-safety concerns. The trial court denied defendant's motion. The jury found defendant guilty on the interfering charge and acquitted defendant on the resisting charge, and the court entered judgment accordingly.[1]

Defendant appealed,[2] assigning error to the trial court's denial of his motion for judgment of acquittal. Defendant asserted that Crino had stopped him in violation of Article I, section 9, and that Crino's subsequent order that defendant turn and be handcuffed also was unlawful. Defendant argued that, under this court's decision in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), officer-safety concerns can justify an otherwise unconstitutional search or seizure only when effected during a "lawful encounter."

The Court of Appeals disagreed, relying on its prior cases involving ORS 162.217(1)(b) and holding that, for purposes of that statute, the lawfulness of an encounter does not affect the lawfulness of a subsequent order. *State v. Kreis*, 294 Or App 554, 559, 432 P3d 245 (2018). The court acknowledged the tension between its cases and *Bates*, which involved a motion to supress evidence and not a conviction for interfering with a peace officer, but explained that, as presented, the court was not in a position to resolve that tension: Defendant had not argued that the Court of Appeals cases involving the interfering statute were irreconcilable with *Bates* or that the Court of Appeals must overrule those cases. *Id.* at 561-62. Applying its rule from those cases, the court reasoned that the question before it was not

---

[1] The court's judgment also required that defendant pay attorney fees for services provided in conjunction with both the interfering and resisting arrest charges. Defendant assigned error to that ruling, and the Court of Appeals affirmed. *State v. Kreis*, 294 Or App 554, 562-63, 432 P3d 245 (2018). We allowed review of that issue, but, because we reverse defendant's conviction, we do not reach it.

[2] Defendant appealed from a judgment entered by the Beaverton Municipal Court. Under ORS 138.035(1), "[a] defendant may take an appeal from *** a municipal court *** that has become a court of record *** to the Court of Appeals[.]"

the lawfulness of the initial stop but of the subsequent order, and that, considered independently, orders issued to protect officer safety were lawful orders. Because defendant did not challenge the legitimacy of Crino's officer-safety concerns, the Court of Appeals affirmed the trial court's denial of defendant's motion for judgment of acquittal. *Id*. Defendant sought, and we allowed, review.

## II.   ANALYSIS

In this court, defendant contends, as he did below, that the trial court erred in denying his motion for judgment of acquittal because Crino's order that he turn and be hand-cuffed was not a "lawful order," as that term is used in ORS 162.247(1)(b). That statute provides:

"(1)   A person commits the crime of interfering with a peace officer or parole and probation officer if the person, knowing that another person is a peace officer or a parole and probation officer ***:

"*****

"(b)   Refuses to obey a lawful order by the peace officer or parole and probation officer."

The parties recognize that this court previously has interpreted the term "lawful order" and agree that the definition we provided frames the issue before us: A "lawful order" is an order that is "authorized by, and is not contrary to, substantive law." *See State v. Ausmus*, 336 Or 493, 504, 85 P3d 864 (2003) (so defining "lawful order" in statute proscribing refusal "to comply with a lawful order of the police to disperse"); *see also State v. Illig-Renn*, 341 Or 228, 238, 142 P3d 62 (2006) (reasoning that "lawful" in the interfering statute does not include an order that is "inconsistent with the substantive law").

Drawing from that definition, defendant contends that an order that effects a seizure is authorized by, and not contrary to, substantive law only when issued in compliance with Article I, section 9. According to defendant, Crino did not have the reasonable suspicion constitutionally necessary to stop him, and Crino's officer-safety concerns could not convert an otherwise unlawful order into a lawful one, because, according to defendant, the officer-safety

doctrine applies only during a lawful police encounter. The state responds that officers have broad authority to issue orders and that their orders are contrary to substantive law only when they direct a person to commit a crime or to refrain from statutorily or constitutionally protected activity. According to the state, Crino's stop was justified by reasonable suspicion, and, even if it was not, Crino's subsequent order was lawful: Crino did not direct defendant to commit a crime or to refrain from constitutionally protected activity. Alternatively, the state argues that Crino's order was independently justified by his officer-safety concerns.

A.  *Crino's initial stop was not justified by reasonable suspicion.*

As framed by the parties, the first question we must answer is whether Crino's initial stop was justified by reasonable suspicion of criminal activity. An officer has reasonable suspicion when the officer "can point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime." *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). The officer must have a subjective belief that the person stopped has committed, or is about to commit, a crime, and that belief must be objectively reasonable under the totality of the circumstances. *State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1977). An officer's suspicion must be particularized to the individual based on the individual's own conduct. *State v. Miglavs*, 337 Or 1, 12-13, 90 P3d 607 (2004). Reasonable suspicion requires less than probable cause but more than mere speculation. *See State v. Holdorf*, 355 Or 812, 822-23, 333 P3d 982 (2014) (articulating standard).

In this court, the state argues that Crino had reasonable suspicion that defendant was committing criminal trespass, or had committed or was about to commit DUII or attempted DUII.[3] Given that the state makes the former argument for the first time in this court, we discuss only the

---

[3] Below, the state also argued that Crino had reasonable suspicion that defendant was committing or was about to commit theft. The state does not renew that argument here, and we do not address it.

state's latter argument.[4] And, for the reasons that follow, we conclude that the facts in the record are insufficient to support a finding that Crino had an objectively reasonable belief that defendant had committed or was about to commit DUII or attempted DUII.[5]

A person "commits the offense of [DUII] if the person drives a vehicle while the person: (a) [h]as a 0.08 percent or more [BAC] \*\*\*; [or] (b) is under the influence of intoxicating liquor." ORS 813.010(1). To constitute an attempt, a person must "intentionally engage[] in conduct which constitutes a substantial step toward commission of the crime." ORS 161.405(1). There is evidence in the record that when Crino approached defendant, defendant exhibited signs of intoxication, and defendant does not dispute that Crino had a reasonable belief that defendant was intoxicated. Instead, defendant argues that the record does not indicate that defendant had taken a substantial step toward driving or was about to drive a vehicle.

The state argues that Crino had reasonable suspicion that defendant was about to drive or had taken a substantial step toward driving, relying on the fact that Crino saw defendant standing "near" a car in the parking lot of a closed restaurant after midnight. The state adds that there was evidence that defendant matched the description of the car's owner, that the parking lot was located a distance away from the road, and that there were few places within walking distance. Therefore, according to the state, Crino reasonably could conclude, based on his training and

---

[4] In the trial court, the state did not argue, in response to defendant's motion for judgment of acquittal, that Crino had reasonable suspicion that defendant was committing or was about to commit criminal trespass. When certain conditions are met, we can affirm a trial court's decision on a basis not argued there. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (articulating conditions necessary for argument that trial court was correct in its ruling, but for reason not advanced there). But, in this case, the state does not contend that those conditions are met or develop that argument, and we therefore decline to address it.

[5] Neither party appears to argue that the evidence required to establish the lawfulness of the stop varies depending on whether Crino believed defendant had or was about to commit DUII or attempted DUII. At any rate, we conclude that the record is insufficient to establish that the stop was justified by reasonable suspicion of either DUII or attempted DUII.

experience, that defendant had taken a substantial step toward driving or was about to do so.

We disagree. Although "officers reasonably may draw inferences about human behavior from their training and experience," *Miglavs*, 337 Or at 13, an officer's "hunch" based on training and experience is, by itself, insufficient to form a basis for reasonable suspicion, *see State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977) ("[I]nstinct and experience cannot *** form the entire basis for 'reasonable suspicion.'"). An officer's belief is objectively reasonable only if it is based on the individual's own conduct. *Miglavs*, 337 Or at 12. Here, Crino's knowledge about defendant's conduct was minimal: Although Crino testified that he saw defendant standing "near" a parked car, Crino did not know that the car belonged to defendant and did not see defendant at the door of the car or holding keys. That knowledge was insufficient to give rise to reasonable suspicion that, at the time that defendant was standing "near" the car in the parking lot, defendant had taken a substantial step toward driving. It also was insufficient to give rise to reasonable suspicion that, at the time that defendant stood at the back door of the restaurant, he was about to commit DUII. By that time, defendant had walked away from the parking lot where the car was located.[6] Perhaps defendant intended to return to the parking lot and drive away while Crino watched, but, absent some indication that defendant was about to do so, Crino's suspicion that defendant was about to commit DUII was not objectively reasonable. We conclude that Crino's stop of defendant was not supported by reasonable suspicion of attempted DUII or DUII, and we turn to the more difficult question of whether Crino's order to effectuate that stop—his order that defendant turn and be handcuffed—was, nevertheless, a "lawful order" under ORS 162.247(1)(b).

B.  *Crino's order was not a "lawful order."*

As discussed, under ORS 162.247(1)(b), a "lawful order" is an order that is authorized by, and is not contrary

---

[6] Crino testified that he had reasonable suspicion that a crime was "either occurring or about to occur with [defendant] lurking around the parking lot. Also, potentially going to drive out of the parking lot if that was indeed his vehicle."

to, substantive law. No party argues that the legislature intended any other meaning of that term; thus, our inquiry is not one of statutory construction, but is one of substantive law: Was Crino's order that defendant turn and be handcuffed an order that was authorized by, and not contrary to, substantive law? To answer that question, a court must consider the authority granted, and the restrictions imposed, by the substantive law, and that is now our task. In undertaking it, we engage, as the legislature intended, in a judicial analysis of the substantive law to determine whether Crino's order was "lawful."[7]

The state contends that officers have broad authority to issue orders and that an order is contrary to substantive law only if it directs a person to commit a crime or to refrain from statutorily or constitutionally protected activity. Crino's order, the state argues, was not of that ilk: Crino did not direct defendant to commit a crime, and defendant had no statutory or constitutional right to ball his fists, take a bladed stance, and place Crino in apprehension of injury. Consequently, the state argues, Crino's order was not contrary to substantive law. Alternatively, the state argues that Crino's order was independently justified by his officer-safety concerns.[8]

We agree with the state's opening proposition that peace officers have broad authority to investigate crime and

---

[7] For that reason, we differ with the dissent in the importance of Court of Appeals cases decided prior to the amendment of ORS 162.247 in 1997 and the related legislative history. The legislature left the determination of what is authorized by, and not contrary to, substantive law to the courts, and the court is the final decision-maker on those state issues. Witnesses and legislators may have thought that officer safety was an important consideration in the enactment of the amendments to ORS 162.247, and we do not deny that it was, but the legislature decided to permit prosecution only for refusing to obey orders that do not violate the substantive law, leaving that judicial determination to the courts.

[8] The state also argues that when an order is "lawful by its terms," it does not become unlawful merely because it is given during an unlawful seizure. The state argues that the text, context, and legislative history of ORS 162.247 demonstrate that an order's lawfulness does not turn on an encounter's lawfulness. We do not address those arguments because, for purposes of this opinion, we accept them. Therefore, we agree with the dissent that, for purposes of ORS 162.247, a court must look at an order independently of the validity of the initial police confrontation. *See State v. Kreis*, 365 Or 659, 683, 451 P3d 954 (2019) (Balmer, J., dissenting).

protect the public.[9] However, we disagree with the state's argument that Crino's order directing defendant to turn and be handcuffed was not contrary to substantive law. First, we reject the idea that an order is contrary to substantive law only when an officer directs a person to commit a crime or refrain from protected activity. In *Illig-Renn*, we considered the constitutionality of the interfering statute, and we explained that the word "lawful" removes from the statute's sweep "any refusal to follow an order that is inconsistent with the substantive law, including constitutional provisions." 341 Or at 238. The constitutional provisions at issue in *Illig-Renn* were provisions guaranteeing the right of free expression and assembly. *Id.* However, as the state acknowledges, the same principle applies when an individual fails to follow an order that is inconsistent with other constitutional provisions, including the provision that protects the right to be free from unreasonable search and seizure. Accordingly, an order that is not consistent with Article I, section 9, or that is issued in violation of that provision, is not a "lawful order" for purposes of ORS 162.247 (1)(b).[10]

Second, when we analyze Crino's order to turn and be handcuffed, we conclude that it is not consistent with Article I, section 9. In conducting that analysis, we consider the state's two distinct arguments: (1) that, when considered independently, and without regard to the legality of Crino's initial seizure, Crino's order to turn and be handcuffed was "lawful by its terms" because it was not an order to refrain from constitutionally protected activity; and (2) that, even if that order was not "lawful by its terms," it was constitutionally justified by the officer-safety doctrine.

---

[9] For example, in addition to having authority to stop persons to investigate criminal activity and arrest persons upon probable cause, peace officers have authority to perform "any lawful acts that are inherent in the duty of the peace officer to serve and protect the public." ORS 133.033(2).

[10] We do not read the Court of Appeals cases cited by the dissent or the legislative history of ORS 162.247 as suggesting that the term "lawful order" means something different. *See, e.g.*, *State v Wilson*, 283 Or App 823, 828, 390 P3d 1114, *rev den*, 361 Or 801 (2017) (citing *Ausmus* for the proposition that an order is lawful if it is "authorized by, and is not contrary to, substantive law"); *State v. Navickas*, 271 Or App 447, 450, 351 P3d 801, *rev den*, 358 Or 248 (2015) (same).

The state's first argument, that Crino's order was "lawful by its terms," is an argument that does not rely on the officer-safety doctrine. It is an argument that defendant did not have a "right" to engage in the conduct that he did, and therefore, that Crino's order was lawful. The problem with that argument is that Article I, section 9, limits the actions of law enforcement; it does not proscribe or prohibit the actions of the public. Article I, section 9, grants Oregonians a right to be free from unreasonable searches and seizures, and an officer violates that right if the officer seizes an individual without constitutional justification. *Holdorf*, 355 Or at 823-24. When an officer seizes an individual, we do not examine whether the individual had the "right" to engage in particular activity; instead, we examine whether the officer had a constitutional justification for the seizure. When an officer has reasonable suspicion that a person has engaged or is about to engage in activity that constitutes a crime, an officer may seize that person to investigate further, not because the person does not have a "right" to engage in that activity, but because the officer's interference with that individual's liberty interest is constitutionally justified. Here, the state contends that Crino's order that defendant turn and be handcuffed did not violate substantive law because defendant had no "right" to ball his fists, take a bladed stance, or place Crino in apprehension of injury; the state does not contend that Crino issued that order because Crino had a reasonable suspicion that defendant had violated or was about to violate Oregon law. The state does not contend, for instance, that when defendant balled his fists, took a bladed stance, and placed Crino in apprehension of injury, Crino had reasonable suspicion that defendant's conduct amounted to disorderly conduct (ORS 166.025), menacing (ORS 163.190), or harassment (ORS 166.065).[11] If Crino had had reasonable suspicion that defendant was about to commit those or other crimes, then we would

---

[11] Defendant does not seem to dispute that, if we were to hold that the officer-safety doctrine provided constitutional justification for Crino's order, then the requirements of that doctrine would be met—that Crino in fact had reasonable officer-safety concerns. We do not hold that such concerns could not give rise to reasonable suspicion of criminal activity; we note only that the state does not so argue here.

agree that Crino's seizure would have been constitution-
ally justified and "lawful" for purposes of ORS 162.247
(1)(b).[12] But we do not agree with the state that Crino's
order was "lawful by its terms" because defendant had no
"right" to engage in the conduct that he did. An order is
also not "contrary to substantive law" only when it is an
order to refrain from constitutionally protected activity.
An order is also contrary to substantive law when it inter-
feres with an individual's liberty interest to be free from
unreasonable searches and seizures. Here, defendant had
a liberty interest with which Crino could not interfere
absent constitutional justification.

We therefore proceed to the state's alternative argu-
ment that Crino's officer-safety concerns provided the con-
stitutional justification for his order. We begin our analysis
by recognizing that reasonable officer-safety concerns can,
indeed, justify an otherwise unconstitutional search or sei-
zure. *Bates*, 304 Or at 524. In *Bates*, officers had lawfully
stopped the defendant for a traffic violation, and, after they
noticed a bag underneath his feet, they grew concerned that
the defendant posed a threat to their safety. *Id.* at 521-22.
When the officers asked the defendant to pull the bag into
sight, he reached down and put his hand near the bag but
would not pull it into view. *Id.* Concerned for their safety,
the officers ordered the defendant out of the car and subse-
quently searched him and the bag, discovering evidence of
criminal activity. *Id.* Although we did not uphold the offi-
cers' actions in that case, we did explain that Article I, sec-
tion 9, permits officers to take reasonable steps to protect
their safety and the safety of others during the course of
lawful encounters:

---

[12] We note, however, that when the issue is not the lawfulness of a police
order under ORS 162.247(1)(b), but, instead, whether an unconstitutional act
requires suppression of evidence, the analysis may be different. This case does
not involve a question of whether evidence should be suppressed following Crino's
unconstitutional stop; thus, the state does not need to show that Crino's order
was not "tainted" by that stop. *See State v. Unger*, 356 Or 59, 88-91, 333 P3d 1009
(2014) (when determining whether evidence must be suppressed because it was
obtained in violation of the defendant's constitutional rights, the state must show
that the evidence was not "tainted" by that violation). As we explain, we differ
with the state as to whether the officer's order was "lawful by its terms." Under
Article I, section 9, an order that constitutes a seizure is "lawful by its terms"
only if it is constitutionally justified.

"Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect [him-or-herself] or others if, *during the course of a lawful encounter with a citizen*, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or others then present."

*Id.* at 524 (emphasis added).

Since *Bates,* we have continued to uphold searches and seizures that have occurred during investigatory stops but without reasonable suspicion that those who were seized had committed or were about to commit a crime. For instance, in *State v. Morgan*, 348 Or 283, 285, 230 P3d 928 (2010), officers stopped a car based on reasonable suspicion of the driver's criminal activity, but searched the defendant, a passenger, based on safety concerns. And, in *Miglavs*, 337 Or at 3, officers were investigating a curfew violation by the defendant's acquaintance but conducted a pat down of the defendant for safety reasons. We also have applied *Bates* to justify searches and seizures occurring while officers were engaged in other activities. For example, in *State v. Cocke*, 334 Or 1, 9, 45 P3d 109 (2002), the officer-safety doctrine applied to a search of the defendant's room conducted incident to the arrest of another tenant. In *State v. Foster*, 347 Or 1, 3, 217 P3d 168 (2009), we upheld an officer's entry onto the defendant's property while serving a restraining order. And, most recently, in *State v. Madden*, 363 Or 703, 705, 427 P3d 157 (2018), we held that a seizure of an individual without reasonable suspicion could be justified under the officer-safety doctrine if the purpose is to safely execute a search warrant and the seizure is a reasonable response to an officer's safety concerns. In each of those cases, the searches or seizures at issue were constitutionally justified by officer-safety concerns alone; the officers did not have another constitutional basis for their actions.[13]

---

[13] Thus, to the extent that defendant argues that an order that effects a seizure can only be a lawful order when the officer has reasonable suspicion that the individual seized is engaged in criminal activity, defendant is incorrect. At least to effectuate other lawful activity, officer-safety concerns can supply that justification.

Defendant argues, however, that there is a limit to the justification that the officer-safety doctrine can provide: As articulated in *Bates,* the officer-safety doctrine applies only "during the course of a lawful encounter." 304 Or at 524. In defendant's view, the officer-safety doctrine does not provide a constitutional basis for a search or seizure when an officer is not engaged in lawful activity, and officer-safety concerns cannot turn an otherwise unlawful order into a "lawful order" for purposes of ORS 162.247(1)(b).

The state responds that *Bates* describes only one of many circumstances in which officer-safety concerns can justify police action and points us to *State v. Guggenmos*, 350 Or 243, 253 P3d 1042 (2011), for a broader statement of the officer-safety doctrine. The principle that emerges from that case, the state contends, is that if officers are engaged in good-faith police work in a place they are entitled to be, they may issue "lawful orders" to protect themselves.

In *Guggenmos*, officers went to a residence to conduct a "knock and talk" and learn if residents with outstanding warrants were present. *Id.* at 246. The officers were invited inside and given permission to search. *Id.* During the search, and contrary to one resident's statement concerning the number of people in the house, an officer, Mogle, saw two men—one of whom was the defendant—run down the stairs toward a back door. *Id.* Mogle ran after the men and yelled at them to stop, but the men did not heed Mogle's command. *Id.* After an officer, who was waiting outside, stopped the men, Mogle went back inside to "clear" the house to make sure there were not any other persons present. *Id.* at 246-47. During that search, Mogle discovered drugs sitting in plain view in the defendant's bedroom. *Id.* at 248.

This court ultimately determined that the officers did not have reasonable suspicion of an immediate threat to their safety sufficient to justify the search. *Id.* at 260. On the way to that conclusion, however, we explained that a protective sweep, though not its own exception to the warrant requirement, may be justified under the "court's standards for an officer safety search." *Id.* at 251. In response to the defendant's argument that the protective sweep was not permissible because it was not made incident to an arrest,

we explained that the defendant read the cases on which he relied too narrowly:

> "*Bates* confirmed that the necessity of taking protective measures can arise 'during the course of a lawful encounter with a citizen \*\*\*.' [*State v. Cocke*, 334 Or 1, 9, 45 P3d 109 (2002)], stated that the officer-safety justification applies to the actions of police officers responding to an immediate threat *when they are in a place where they are entitled to be.* But, as *Bates* and *Cocke* indicated, an officer's *lawful encounter* with a citizen may give rise to a reasonable suspicion that the citizen poses an immediate threat of serious physical injury to the officer or others regardless of whether the officer is conducting an arrest. That kind of encounter may occur when the police are *lawfully present* in a private residence or an occupied building, even if they have no intention of arresting anyone."

*Id.* at 254 (emphases added; omission in original).

The state reads that passage from *Guggenmos* to identify two circumstances in which officers are authorized to take reasonable officer-safety precautions under *Bates*: (1) during *lawful* encounters with citizens when there is a reasonable suspicion of an immediate threat to safety; and (2) when officers are in a place "where they are entitled to be" and are "responding to an immediate threat." The state contends that the second circumstance encompasses situations "when an initial encounter might straddle the line between a lawful and unlawful seizure." The second circumstance, the state asserts, deserves protection under *Bates*, as the purpose of the officer-safety doctrine is to allow officers to take reasonable precautions to minimize risks that could arise during all encounters with citizens.

We do not read *Guggenmos* as an intentional expansion of the officer-safety doctrine. Immediately after its initial description of the officers in *Cocke* as being where they were entitled to be, the court, in *Guggenmos*, describes those officers as being engaged in a "lawful encounter." 350 Or at 254. In all of the cases in which we have applied *Bates,* we have noted or assumed that the officers were engaged in lawful police activity when their safety concerns arose, and we do not understand *Guggenmos* as a deliberate departure from the officer-safety doctrine as articulated in

*Bates*.[14] That does not mean, however, that we are foreclosed from extending the officer-safety doctrine beyond the circumstances described in *Bates* and concluding, as the state urges, that all reasonable orders issued to protect officer safety are constitutionally justified.

The state argues that the purpose of the officer-safety doctrine is to keep officers safe during all encounters, and that that purpose is served if it permits officers to take reasonable safety precautions against all threats that arise, including those that arise during encounters later determined to be unlawful. The state asks that we interpret Article I, section 9, to permit reasonable orders to protect officer safety even when issued to effectuate an unlawful stop.

---

[14] We also do not read the other cases cited by the state as extending the officer-safety doctrine beyond lawful encounters. In *Miglavs*, the lawfulness of the encounter between the officer and defendant's acquaintance was not specifically at issue; however, the officer engaged the defendant and his acquaintance for the same reason, which was to investigate curfew violations. This court explained that the lawfulness of the encounter determined whether *Bates* applied, and that the defendant conceded that his encounter with the officer was lawful. *Miglavs*, 337 Or at 12 (noting that the defendant "concedes that [the officer] was engaged in a lawful contact with [the] defendant").

The state cites our recent decision in *Madden* as "observing the likelihood, but not deciding, that [the] initial seizure [of the defendant] was lawful before applying the officer-safety rule." *See Madden*, 363 Or at 724 n 16 (noting that the detective who seized defendant for safety reasons also suspected that defendant was engaged in criminal activity). Although it is true this court did not analyze whether the detective in *Madden* could have seized the defendant based on reasonable suspicion of criminal activity, we did not need to because the officer was engaged in other lawful police activity—the execution of a search warrant at a house where the defendant happened to be sitting in the driveway.

The same is true of *Foster*. In *Foster*, the officers were engaged in serving a restraining order, and one of the officers went beyond the front door of the residence to a side window and looked inside. 347 Or at 4. The state contends that *Foster* observed the possibility, but did not decide, that the "initial entry onto curtilage was not fully justified by existing privileges before applying [the] officer-safety rule." *See id.* at 9 n 5 (noting that, in addition to the privilege of implied consent to go to the front door, the privilege to execute civil process, coupled with the sheriff's duty under Oregon law to serve court orders, could have applied to the situation, though it would not necessarily "permit the server to roam at will across the property"). As in *Madden*, this court did not need to analyze whether a privilege permitted the officer to take a position beneath the window on the defendant's property before determining whether the officer-safety doctrine applied; the lawful activity—which was not challenged in that case—was serving a restraining order. The question was whether the officer-safety doctrine permitted police action—positioning beneath a window—taken to effectuate that activity.

We recognize that police officers work in dangerous settings and encounter daily threats that may require officers to take safety precautions that we are not entitled to uncharitably second-guess. *Bates*, 304 Or at 524. But we do not agree that those dangers provide an independent constitutional justification for all orders issued to counter them. It is important to remain cognizant that Article I, section 9, grants the people a "liberty interest to be free from unreasonable searches and seizures." *Holdorf*, 355 Or at 822-23. Officers are precluded from arresting an individual unless they have a warrant, the restraint is justified by an exception to the warrant requirement, or, for investigatory stops that fall short of an arrest, the stop is justified by reasonable suspicion that an individual has committed or is about to commit a crime. *See State v. Fair*, 353 Or 588, 608-09, 302 P3d 417 (2013) (an arrest based on probable cause requires warrant or exception to warrant requirement, and "temporary detention of criminal suspects" requires reasonable suspicion). The officer-safety doctrine is not a general exception to the warrant requirement; it is a rule of necessity that enables officers to take reasonable measures to carry out lawful police activity. *See Bates*, 304 Or at 524 ("The officer should be permitted to take every reasonable precaution to safeguard his life in the process of making the arrest." (Internal citation and quotation omitted.)); *see also* ORS 131.615(5) (when making a stop, an officer "may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer").

When officers have reasonable suspicion of criminal activity, they may temporarily seize an individual to conduct further investigation and issue orders reasonably necessary to do so, including orders reasonably necessary to protect their safety.[15] *See, e.g., Bates*, 304 Or at 524 (permitting officers to take safety precautions during lawful stop).

---

[15] In this case we do not decide whether an officer's safety concerns could justify a seizure if those concerns arose during the course of a noncoercive conversation. Although not raised here, it is important to remember that, even if permitted, action taken to protect officer safety must be a reasonably necessary response to the perceived threat. *See State v. Foster*, 347 Or 1, 12, 217 P3d 168 (2009) ("The [officer-safety] doctrine generally requires that an officer's response to officer safety concerns be reasonable in light of the specifically articulated and reasonably perceived circumstances.").

But, when, as here, an officer has made an initial, unlawful seizure, and there is no independent constitutional justification for further restraint, the officer-safety doctrine does not permit the officer to impose continued, and even more stringent, restraint to effectuate that unlawful seizure.[16] If we were to conclude that the officer-safety doctrine grants such authority, we would be expanding the doctrine beyond its purpose and diminishing the rights guaranteed by Article I, section 9. We are unwilling to do so.

In reaching that conclusion, we understand that there may be circumstances in which officers are not certain that an encounter is lawful; an encounter may, as the state suggests, "straddle the line." For instance, an officer may not be certain that an order to stop is justified by reasonable suspicion or that an order to disperse is issued in accordance with the guarantees of free speech and assembly. That uncertainty is understandable, but it is not material for purposes of ORS 162.247(1)(b). As we explained in *Illig-Renn*, by including the word "lawful" in that statute, the legislature "remov[ed] from the statute's sweep any refusal to follow an order that is inconsistent with the substantive law, including constitutional provisions." 341 Or at 238. If an officer issues an order that is inconsistent with Article I, section 9, an individual who refuses to obey that order does not violate ORS 162.247(1)(b).

In summary, ORS 162.247(1)(b) makes it a crime for an individual to disobey a "lawful order." An order that restrains an individual's liberty in violation of Article I, section 9, is not a "lawful order" for purposes of that statute. In this case, because Crino did not have reasonable suspicion

---

[16] Contrary to the dissent's suggestion, we do not overturn the principle that, for purposes of ORS 162.247(1)(b), the lawfulness of an order is to be judged independently of the validity of the initial police confrontation. We hold only that when there is no constitutional justification for an initial seizure, such as reasonable suspicion of criminal activity, and an officer is unconstitutionally restraining an individual without an independent constitutional basis for doing so, the officer-safety doctrine and Article I, section 9, do not permit the officer to impose continued, even more stringent, restraint to effectuate the seizure. We do not arrive at that conclusion to provide a "remedy" for the initial constitutional violation, or to deter police misconduct. We arrive at that conclusion because, in our view, Article I, section 9, does not permit that continued, more stringent, interference with an individual's liberty interest.

that defendant had committed or was about to commit DUII or attempted DUII, his seizure of defendant violated Article I, section 9. Crino's subsequent order that defendant turn and be handcuffed also was not constitutionally justified and was therefore inconsistent with that constitutional provision. We therefore conclude that Crino's order was not a "lawful order" for purposes of ORS 162.247(1)(b), and that the trial court erred in denying defendant's motion for judgment of acquittal.

The decision of the Court of Appeals is reversed. The judgment of the Beaverton Municipal Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

**BALMER, J.,** dissenting.

For more than 35 years, Court of Appeals caselaw has held that "the lawfulness of an order based on officer safety is to be judged independently of the validity of the initial police-citizen confrontation." *State v. Kreis*, 294 Or App 554, 559, 432 P3d 245 (2018) (citing cases). That rule requires citizens to follow police orders that are based on a reasonable, fact-based concern for the safety of police or others—even if a court later determines that the police lacked reasonable suspicion to detain the person at the time of the initial citizen contact. The salutary effect of the rule is to help de-escalate police-citizen confrontations; protect officer and public safety; and allow police to perform community care-taking functions, control crowds at public events when behavior turns dangerous, and investigate often ambiguous domestic violence situations.

The majority today states that it agrees that "the lawfulness of an order is to be judged independently of the validity of the initial police confrontation." 365 Or at 676 n 15. However, the majority holds—contrary to those cases with which it purports to agree—that "when there is no constitutional justification for an initial seizure, such as reasonable suspicion of criminal activity, and an officer [seizes] an individual without an independent constitutional basis for doing so, the officer-safety doctrine and Article I, section 9, do not permit the officer to impose continued, even

more stringent, restraint to effectuate the seizure."[1] *Id*. In so holding, the majority today muddies the standards required of police officers under Article I, section 9. Because, in my view, the majority's holding is not required by our cases or by any reasonable interpretation of ORS 162.247(1)(b), and is not necessary to protect a defendant's Article I, section 9, rights, I respectfully dissent.

I first outline the Court of Appeals caselaw with which the majority theoretically agrees but with which its ultimate holding conflicts. Then, because this case turns— or should turn—on the interpretation of ORS 162.247(1)(b), I consider the text and legislative history of that statute which, in my view, supports the result below. Finally, I discuss the Article I, section 9, overlay that appears to drive the majority's decision and explain why the majority errs in its holding today.

## THE COURT OF APPEALS CASES
## FROM *GAFFNEY* TO *KREIS*

The Court of Appeals decisions are persuasive in their own right and also are important because that court's binding interpretation of the term "lawful order" when the interference statute was amended in 1997 tells us how the legislature understood the term at that time—and what they intended the term to mean in ORS 162.247(1)(b).

The Court of Appeals first encountered a related issue in *State v. Gaffney*, 36 Or App 105, 583 P2d 582 (1978), *rev den*, 285 Or 195 (1979), where the trial court had dismissed harassment and criminal mischief charges against the defendant for fighting with police and damaging a police car after he disobeyed police orders to stop and officers attempted to pat him down for weapons. The trial court had

---

[1] A "seizure" for purposes of Article I, section 9, occurs "when either (1) a police officer intentionally and significantly interferes with the person's freedom of movement; or (2) the person believes, in an objectively reasonable manner, that his or her liberty of movement has been so restricted." *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010). A "stop" is "a temporary restraint of a person's liberty for the purpose of criminal investigation," and qualifies as a "seizure" under Article I, section 9. *Id*. at 620. I use the terms "stop" and "seizure" interchangeably in this opinion. The majority describes the police interaction with defendant, prior to the officer-safety-based order at issue here, as a "seizure." 365 Or at 677. I agree with that characterization.

held that, because the police lacked probable cause for the initial stop, Article I, section 9, required the suppression of evidence of all actions by the defendant following the stop, including evidence that would support his prosecution for crimes against the officers. The Court of Appeals reversed, holding that, although the exclusionary rule would prohibit the use of evidence obtained based on the unlawful stop,

> "[t]he purposes underlying the exclusionary rule would not be well served by the exclusion of evidence of independent crimes directed at officers who illegally stop, frisk, arrest or search. Moreover, the results of such an extension of the exclusionary rule would be intolerable. A person who correctly felt that he had been illegally stopped, for example, could respond with unlimited violence and under an exclusionary rule be immunized from criminal responsibility for any action taken after the stop. That cannot be an appropriate rule."

36 Or App at 108-09 (citing cases from Illinois, North Carolina, and New York).[2]

The Court of Appeals applied that rule in numerous later cases, including *State v. Rodinsky*, 60 Or App 193, 653 P2d 551 (1982), where the defendant, who was the subject of a traffic stop, disobeyed a police order to remain in her car (and 12 requests to return to her car, after she left it and approached the police car) and was loud and abusive towards police. She was charged with failing to obey a police officer under *former* ORS 487.100(1) (1981), which made it an offense to "fail[] to comply with any lawful order, signal or direction of a police officer * * *." The Court of Appeals held that, even if the traffic stop was unlawful (as the defendant had argued), "that did not immunize her from the consequences of her subsequent conduct and did not deprive the officer of the authority to respond to those actions by appropriate orders." 60 Or App at 196.

As I discuss in greater detail below, the statute making it an offense to interfere with a peace officer by refusing

---

[2] I do not necessarily agree with everything that the Court of Appeals said in *Gaffney*, in part because it relied on "stop and frisk" statutes no longer on the books. I quote it because it is the basis for the Court of Appeals' more recent cases on this issue and because it contains some seeds of wisdom.

to obey a "lawful order of [a] peace officer," ORS 162.247(1)(b), has been amended a number of times, but the critical term "lawful order" was also in the version of the statute applied in *Rodinsky* and in all subsequent versions. And the Court of Appeals has continued to apply its earlier caselaw. In *State v. Neill,* 216 Or App 499, 173 P3d 1262 (2007), *rev den*, 344 Or 671 (2008), the defendant was charged under that statute when police were sent to a scene of domestic violence following a 9-1-1 call and found a bloody victim, damaged property, and other evidence of fighting. Although the blood and damaged property suggested that a crime had recently been committed, the defendant asserted there was no valid basis for the police to enter her apartment and that all evidence resulting from that unlawful entry should be suppressed, including evidence that she had refused to obey multiple officer orders, several of which were based on officer-safety concerns. The Court of Appeals extended earlier decisions such as *Gaffney*, which had involved crimes *against* police officers following an unlawful search or seizure, to situations where the defendant had threatened officer safety. *Neill,* 216 Or App at 507. Because the defendant's conduct "reasonably led the officers to be concerned that defendant posed a legitimate threat to their safety and their ability to maintain control of a potentially dangerous situation," the defendant was required to obey their reasonable orders:

> "That the police may have acted unlawfully in initiating the search did not free defendant to interfere with reasonable directions by the police designed to reduce the risk of violence and maintain safety once the search had commenced. As in *Gaffney* and its progeny, to hold otherwise would be intolerable and would not serve to advance the purposes underlying the exclusionary rule."

*Id.* at 508.

Moreover, and directly relevant to this case, the court in *Neill* also rejected the defendant's argument that her motion for judgment of acquittal should have been granted because the officer's order was not "lawful" under ORS 162.247(1)(b). *Id.* at 508-09. The court reasoned that the same rationale for admitting evidence of the defendant's failure to comply with reasonable officer-safety-based orders indicated that those orders were lawful: "The lawfulness

of the order disobeyed is to be judged independently of the validity of the initial police-citizen confrontation." *Id.* at 509 (quoting *Rodinsky,* 60 Or App at 196). The court also noted that "the order itself cannot be said to be unlawful for the purpose of precluding prosecution for failure to obey it." *Neill*, 216 Or App at 508.

Another variation on the same theme was *State v. Bistrika*, 261 Or App 710, 322 P3d 583, *rev den*, 356 Or 397 (2014), *cert den*, ___ US ___ (2015), where police officers had lawfully entered private property to provide emergency aid under ORS 133.033, but the emergency had dissipated, and the officers no longer had a lawful basis to remain on the property. *Id.* at 714. The court thus assumed that the officers were in violation of defendant's Article I, section 9, rights when they gave orders to defendant and other family members in response to reasonable threats to the officers' safety. *Id.* at 714-16. But the court nevertheless held that the trial court correctly had denied defendant's motion for judgment of acquittal on the charge of interfering with a peace officer: Even if the defendant's Article I, section 9, rights had been violated, whether the order was a "lawful order" for purposes of ORS 162.247(1)(b) was a separate question, and "the deputies' orders were 'reasonable in light of [the threat to officer safety], and defendant's refusal to obey the orders added to the threat.'" *Id.* at 718 (quoting *Neill*, 216 Or App at 508).[3]

The Court of Appeals reviewed those cases again in *State v. Wilson*, 283 Or App 823, 828, 390 P3d 1114 (2017), and addressed further arguments about the "lawfulness" of officer-safety-based orders:

> "'An order is "lawful" if it is authorized by, and is not contrary to, substantive law.' *State v. Navickas*, 271 Or App 447, 450, 351 P3d 801, *rev den*, 358 Or 248 (2015) (citing *State v. Ausmus*, 336 Or 493, 504, 85 P3d 864 (2004)). 'When examining whether an order is "lawful," *** we look at whether the order at issue was lawful on its face.' *Id.* at 451. Of critical importance here, 'the "lawfulness of the order disobeyed is to be judged independently of the

---

[3] The court ultimately reversed and remanded the interfering convictions on the separate ground of instructional error. *Bistrika*, 261 Or App at 730.

validity of the initial police-citizen confrontation."' [citation omitted]."

That line of Court of Appeals decisions shows a careful distinction between the lawfulness of an initial stop or search and the lawfulness of a later police directive or order that is motivated by officer or public safety. And that distinction makes perfect sense, for reasons the Court of Appeals has explained repeatedly since *Gaffney*. The unlawful search or seizure of a citizen or unlawful entry into a home violates the citizen's (or noncitizen's) right under Article I, section 9, to be free from unreasonable searches or seizures. To redress such constitutional violations, and to deter police conduct that violates those rights, we suppress evidence obtained from such searches, unless it comes within some exception to the warrant requirement. But once a search or seizure has occurred—whether it is later judged to be lawful or unlawful—the safety of law enforcement personnel, potential victims, bystanders, and defendants requires that those in the vicinity follow *reasonable* officer orders based on the officers' *reasonable* concerns for their safety or the safety of others. The majority's approach chips away at that longstanding aspect of Oregon law.

## THE MEANING OF "LAWFUL ORDER"
## IN THE INTERFERENCE STATUTE

The Court of Appeals cases are consistent with the text of ORS 162.247(1)(b), which provides that a person commits the offense of interfering with a peace officer, when, "knowing that another person is a peace officer," he or she "[r]efuses to obey a lawful order by the peace officer." Nothing in that text suggests that an order is "lawful" for purposes of the offense of interfering with a peace officer only if the initial seizure was justified by reasonable suspicion or probable cause. The question the statute asks is whether the *order* was lawful, not whether the initial encounter was lawful, not lawful, or somewhere in the ambiguous area between the two that we see, for example, in this case or in responding to a domestic disturbance 9-1-1 call, as in *Neill*.[4] The

---

[4] Here, of course, as the majority notes, defendant does not dispute the reasonableness of the officer-safety concerns, or the reasonableness of the order as a response to those concerns. 365 Or at 663-64.

statute itself thus does not state or imply that the lawfulness of the initial seizure or search has any bearing on the lawfulness of a *later* police order based on *later* conduct of the defendant. The legislature knows how to write statutes that do turn on whether the initial stop was lawful. *See* ORS 807.570(1)(b)(A) (requiring person to obey officer request if the person is "lawfully stopped or detained"). ORS 162.247 (1)(b) is not such a statute.

The Court of Appeals cases are also relevant because they inform our understanding of what the legislature intended when it adopted the current version of the interfering with a police officer statute. That statute was amended in 1997 because other laws prohibited resisting arrest, but did not prevent interference with police-citizen encounters short of arrest. *See* Tape Recording, Senate Committee on Crimes and Corrections, SB 423, Feb 19, 1997, Tape 13, Side A (comments of Rep Floyd Prozanski). When one police officer testified, in response to a question about how he understood the term "lawful order," he gave as an example of an interaction short of arrest,

"a traffic stop where you might be performing field-sobriety tests and somebody who's in the car is getting out and coming back or wanting to become involved. *** [T]here's nothing legally that they're doing wrong other than I might be able to detain them on an officer-safety basis because that's a threat to my ability to do my job. *** But with this law, if that person did cross the line and didn't listen to reason, didn't listen to commands to get back into the vehicle, [he could warn the person that he was about to violate the interference law.]"

Tape Recording, House Committee on Judiciary, Subcommittee on Criminal Law, SB 423, June 5, 1997, Tape 140, Side A (statement of Albany Police Officer Eric Carter). Neither Carter, nor any other witness, nor any member of the subcommittee, suggested that the lawfulness of an officer's order would turn on whether the initial stop was valid or not.[5]

---

[5] The legislative history is replete with comments by witnesses and legislators as to the importance to officer safety of a statute penalizing the refusal to obey orders based on that concern. *See* Tape Recording, Senate Committee on Crimes and Corrections, SB 423, Feb 19, 1997, Tape 13, Side A; Tape 14, Side A

As significant, at the time the 1997 amendments were being considered, the Court of Appeals had several decades of cases, discussed above, holding that whether an officer's order was "lawful" was a question independent of whether the initial stop was justified. The court had consistently held that if an order made after the initial stop or search was justified by the individual's conduct *after* the stop or *after* the entry into the home—such as a potential threat to an officer or others—that was a "lawful order," whether the initial stop or entry was lawful or not. That definitive caselaw as to the meaning of a "lawful order" in the statute prohibiting interfering with a peace officer by refusing to obey such an order was a vital part of the statutory context of the 1997 amendments to ORS 162.247 (1)(b). *A.G. v. Guitron*, 351 Or 465, 471, 268 P3d 589 (2011) (explaining that "existing case law forms a part of a statute's context" and that this court's analysis begins "with a review of the law as it existed" at the time a statute was enacted). It strongly suggests that the legislature understood those kinds of orders to be "lawful" and intended the refusal to obey them to be prohibited by ORS 162.247(1)(b).

## THE OFFICER-SAFETY-BASED ORDER HERE WAS A "LAWFUL ORDER"

Rather than probe the text and legislative history of the interference statute, or explain why it departs from the Court of Appeals' cases, the majority relies instead on *State v. Ausmus*, 336 Or 493, 503-04, 85 P3d 864 (2003), where we discussed the term "lawful order" in a different statute, and *State v. Illig-Renn*, 341 Or 228, 338, 142 P3d 62 (2006), where we rejected a facial challenge to the interference statute on the ground that it was unconstitutionally vague and overbroad.

The actual holdings in those cases, as opposed to the *dicta*, are not particularly relevant to the majority's argument. In *Ausmus*, a unanimous court had little trouble

---

(comments of Rep Floyd Prozanski). The state argues that the legislative history demonstrates that the statute also was intended to require compliance with other types of police orders, even if they are not justified by a reasonable officer-safety concern. I express no view regarding that argument because it is not necessary to the resolution of this case.

holding unconstitutional on its face a statute that made it a crime to "congregate[] with other persons in a public place" and to "refuse[] to comply with a lawful order of the police to disperse," if the persons had congregated "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." *Former* ORS 166.025 (1)(e) (2001). The court found that the statute was unconstitutionally overbroad and vague because at least some of the conduct it prohibited was protected by free speech and assembly rights, and the court could find no way to narrowly construe the statute to make it constitutional. That problem is not present here because of the very different statute and the recognized officer-safety basis for the officer's order. Moreover, this case is not a facial challenge to the interference statute, nor does defendant argue that the statute is unconstitutionally overbroad or vague—arguments that have more salience in free expression and similar settings. *See* Wayne R. LaFave, 1 *Search and Seizure* § 1.13(a), 553-54 n 20 (5th ed 2012) (suggesting greater justification may be necessary for failure to obey orders violating First Amendment rights than other officer orders). In *Illig-Renn*, on the other hand, this court *rejected* defendants' challenge to the very statute at issue in this case, ORS 162.247(1)(b), holding that it was not facially overbroad or vague in violation of constitutional protections for speech and assembly. 341 Or at 338. Defendant raises no free speech or assembly argument here.

      The majority instead relies on various statements in those cases about what constitutes a "lawful order," but the cases are distinguishable. In *Ausmus,* we looked to the dictionary to define that term in the statute creating the crime of disorderly conduct and came up with the unsurprising statement that a "lawful order" was one "authorized by, and not contrary to, substantive law." *Ausmus*, 336 Or at 504. But here the order *was* "authorized," because it was a reasonable response to a legitimate concern for officer safety based on defendant's aggressive and threatening conduct after he was stopped. As this court recognized in *Ausmus*, various statutes authorize police to give orders as part of their ordinary investigative, community-caretaking, and protective policing functions. 336 Or at 505-06. And we explicitly held

in *State v. Bates* that an officer may take reasonable actions to protect himself or herself (or others) during an encounter with a citizen, if the officer develops "a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others present." 304 Or 519, 524, 747 P2d 991 (1987). No such officer-safety rationale was advanced as a basis for the orders in *Ausmus* or *Illig-Renn* being "lawful orders." In contrast, the order here was "lawful" in the sense of being "authorized by law" based on *Bates*, as well as other statutes articulating the permitted scope of ordinary police work. And, as noted, defendant does not dispute that the officers who gave the order had reasonable suspicion to believe that he posed a threat of serious bodily harm to them.

Although I think the Court of Appeals' approach has much to recommend it, it also is true that the majority has helpfully reframed the issue that was argued by the parties and decided by the Court of Appeals. The majority does not focus on whether the initial police-citizen encounter was lawful, but instead announces a rule based on whether the later police order independently violated defendant's constitutional rights. *See* 365 Or at 674-77, 675 n 14. The majority agrees that even if the initial encounter results in a seizure that later is determined to be unlawful (as here), the lawfulness of an order in response to defendant's post-seizure conduct will not necessarily turn on the legal validity of the earlier seizure, but rather on whether the *order* "is inconsistent with Article I, section 9." 365 Or at 677. Thus, the majority purports to preserve the concept that the lawfulness of a police order "is to be judged independently of the validity of the initial police citizen confrontation." *Kreis*, 294 Or App at 559.[6] However, the majority goes on to say that where an order that constitutes a seizure is based *only* on

---

[6] The majority's reframing thus suggests that it would conclude that an officer-safety based order that was not "contrary to substantive law" is a "lawful order" for purposes of ORS 162.247(1)(b), even if the order was given in the context of an unlawful search or seizure. Thus, an officer-safety-based order to "drop the gun" presumably would be lawful, even if the initial stop was not. I certainly agree with the majority on that point. But many cases, like this one and the Court of Appeals cases discussed in the text, will involve police orders that may interfere with a person's freedom of movement and thus raise the Article I, section 9, issue upon which the majority and I disagree.

officer-safety concerns—and lacks "an independent consti-
tutional basis," such as reasonable suspicion of criminal
activity—then the inquiry *does* depend on whether there
was a "constitutional justification for [the] initial seizure."
365 Or at 676 n 15.

The majority proceeds to determine that the order
here was not a "lawful order" because it was contrary to sub-
stantive law. The majority asserts that the order to defen-
dant to turn around and put his hands behind his back and
be handcuffed was contrary to substantive law, because
"defendant had a liberty interest with which [the officer]
could not interfere absent constitutional justification," 365
Or at 671, and the officer lacked that justification. I dis-
agree. First, the majority is too quick to dismiss the state's
characterization of defendant's argument: that he claimed
the right "to ball his fists, take a bladed stance, or place
Crino in apprehension of injury.'" *Id.* at 670. In fact, that
was the crux of defendant's argument. This is not a case
where the defendant chose to engage in passive resistance—
inactive, nonviolent noncooperation in response to a police
order, which we have held cannot constitute interference
under ORS 162.247(1)(b). *See State v. McNally*, 361 Or 314,
392 P3d 721 (2017). Rather, after the initial stop, defendant
intentionally engaged in further aggressive and threaten-
ing conduct to which the officers reasonably responded with
the order at issue here. Such orders, until today, have been
considered "lawful orders" under the interference statute,
based on *Bates*. In my view, the officer-safety basis for the
order was sufficient justification under Article I, section 9.

Second, the majority asserts that the order necessar-
ily was unlawful because it "is inconsistent with" Article I,
section 9, as an unjustified seizure of defendant. 365 Or at
677. The flaw in that argument, however, is that, *at the time
of the order, defendant already had been seized.* As presented
to us, this case involves a seizure by police (based on what
they incorrectly believed to be probable cause) and a later
police order, based on valid officer-safety concerns, to defen-
dant to turn around so that he could be handcuffed. But
the order did not result in defendant's seizure by police. The
seizure already had occurred, and the order followed the
seizure. Moreover, it was defendant's *post-seizure* conduct

that led to the order. Whether that order was lawful, as the state argues, or unlawful, as the majority has now concluded, there is no doubt that, as a factual and legal matter, a person in defendant's circumstances is seized only once. I see no particular substance in the majority's statement, not argued by defendant, that the order was a new violation of his liberty interests because it "effectuated" the preexisting and continuing seizure of defendant.

The majority appears to agree that, if the initial stop is lawful—that is, based on reasonable suspicion that the person in question has committed or is about to commit a crime—a later officer-safety-based order also would be lawful and, if not obeyed, could be the basis for an interference charge. And, of course, if the initial stop is lawful and police obtain evidence of the crime for which the defendant was stopped (and perhaps other crimes), that evidence ordinarily can be used in subsequent prosecutions. On the other hand, if the initial stop is unlawful, the person's Article I, section 9, rights are violated, and evidence of the crime for which the person was stopped will be suppressed. The person's constitutional rights will be vindicated, and there will be a deterrent effect on improper police conduct.

But it is a separate issue whether the person *already stopped* must obey a reasonable order based on reasonable concern for the safety of a police officer or another person in the absence of reasonable suspicion that the person is engaged in criminal activity. I see no legal reason why that person should not be required to obey such an order, whether or not the initial stop was lawful. Such a requirement would not violate the person's Article I, section 9, rights. As discussed above, if the initial stop was unlawful, the person already has been unconstitutionally seized, and the remedy that we have long imposed for that violation—suppression of evidence of the crime for which the person was stopped—will be the result. There is no need, in terms of deterrence of police misconduct or vindication of the constitutional rights of a person who is already seized, to hold that an order based on a reasonable physical threat is "unlawful" and to permit the subject of the order to ignore it without consequence. Such a result also is contrary to the intent of the legislature in enacting ORS

162.247(1)(b) and its understanding of how the term "lawful order" would be interpreted by the courts.

It probably should not have to be said, but "immediate threat[s] of serious physical injury to the officer or to others present," *Bates,* 304 Or at 524, are as likely to arise during stops that a court may later determine to be unlawful as during stops that are found to be lawful. Allowing police to give reasonable orders in response to such threats helps prevent confrontations from escalating, protects the safety of officers and the public, and promotes the nonviolent resolution of potentially dangerous situations. The threats are just as real whether the initial basis for the stop was lawful or not. The majority needlessly undermines an important tool for dealing with those threats.

I respectfully dissent.

Garrett, J., joins in this dissent.